GLOBE NEWSPAPER CO. *v.* SUPERIOR COURT
FOR THE COUNTY OF NORFOLK

No. 81–611.   Argued March 29, 1982—Decided June 23, 1982

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 611. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 612. STEVENS, J., filed a dissenting opinion, *post*, p. 620.

*James F. McHugh* argued the cause and filed briefs for appellant.

*Mitchell J. Sikora, Jr.*, Assistant Attorney General of Massachusetts, argued the cause for appellee. With him on the brief were *Francis X. Bellotti*, Attorney General, and *Gerald J. Caruso* and *Alan B. Sherr*, Assistant Attorneys General.*

---

*Briefs of *amici curiae* urging reversal were filed by *Carl R. Ramey, J. Roger Wollenberg, Timothy B. Dyk, Ralph E. Goldberg, Erwin G. Krasnow, J. Laurent Scharff*, and *Carol D. Weisman* for American Broadcasting Cos., Inc., et al.; by *James D. Spaniolo, Gary G. Gerlach, Robert C. Lobdell, A. Daniel Feldman, Robert Sack, P. Cameron Devore, Andrew L. Hughes, Samuel E. Klein, Alan E. Peterson, Bruce W. Sanford,*

JUSTICE BRENNAN delivered the opinion of the Court.

Section 16A of Chapter 278 of the Massachusetts General Laws,[1] as construed by the Massachusetts Supreme Judicial Court, requires trial judges, at trials for specified sexual offenses involving a victim under the age of 18, to exclude the press and general public from the courtroom during the testimony of that victim. The question presented is whether the statute thus construed violates the First Amendment as applied to the States through the Fourteenth Amendment.

## I

The case began when appellant, Globe Newspaper Co. (Globe), unsuccessfully attempted to gain access to a rape trial conducted in the Superior Court for the County of Norfolk, Commonwealth of Massachusetts. The criminal defendant in that trial had been charged with the forcible rape and forced unnatural rape of three girls who were minors at the time of trial—two 16 years of age and one 17. In April 1979, during hearings on several preliminary motions, the trial judge ordered the courtroom closed.[2] Before the trial

---

*J. Laurent Scharff, W. Terry Maguire, Richard M. Schmidt, Jr., Arthur Sackler, Peter C. Gould, Theodore Sherbow, Alexander Wellford, James F. Henderson, David M. Olive, Conrad M. Shumadine,* and *Lawrence Gunnels* for the Miami Herald Publishing Co. et al.; by *Howard Monderer* for the National Broadcasting Co., Inc.; and by *E. Barrett Prettyman, Jr.,* for the Reporters Committee for Freedom of the Press.

[1] Massachusetts Gen. Laws Ann., ch. 278, § 16A (West 1981), provides in pertinent part:

"At the trial of a complaint or indictment for rape, incest, carnal abuse or other crime involving sex, where a minor under eighteen years of age is the person upon, with or against whom the crime is alleged to have been committed, . . . the presiding justice shall exclude the general public from the court room, admitting only such persons as may have a direct interest in the case."

[2] "The court caused a sign marked 'closed' to be placed on the courtroom door, and court personnel turned away people seeking entry." *Globe Newspaper Co. v. Superior Court,* 379 Mass. 846, 848, 401 N. E. 2d 360, 362–363 (1980) (footnote omitted).

began, Globe moved that the court revoke this closure order, hold hearings on any future such orders, and permit appellant to intervene "for the limited purpose of asserting its rights to access to the trial and hearings on related preliminary motions." App. 12a–14a. The trial court denied Globe's motions,[3] relying on Mass. Gen. Laws Ann., ch. 278, § 16A (West 1981), and ordered the exclusion of the press and general public from the courtroom during the trial. The defendant immediately objected to that exclusion order, and the prosecution stated for purposes of the record that the order was issued on the court's "own motion and not at the request of the Commonwealth." App. 18a.

Within hours after the court had issued its exclusion order, Globe sought injunctive relief from a justice of the Supreme Judicial Court of Massachusetts.[4] The next day the justice conducted a hearing, at which the Commonwealth, "on behalf of the victims," waived "whatever rights it [might] have [had] to exclude the press." *Id.*, at 28a.[5] Nevertheless,

---

[3] The court refused to permit Globe to file its motion to intervene and explicitly stated that it would not act on Globe's other motions. App. 17a–18a.

[4] Globe's request was contained in a petition for extraordinary relief filed pursuant to Mass. Gen. Laws Ann., ch. 211, § 3 (West 1958 and Supp. 1982–1983).

[5] The Commonwealth's representative stated:

"[O]ur position before the trial judge [was], and it is before this Court, that in some circumstances a trial judge, where the defendant is asserting his right to a constitutional, public trial, . . . may consider that as outweighing the otherwise legitimate statutory interests, particularly where the Commonwealth [acts] on behalf of the victims, and this is literally on behalf of the victims in the sense that they were consulted fully by the prosecutor in this case. The Commonwealth waives whatever rights it may have to exclude the press." App. 28a.

Some time after the trial began, the prosecuting attorney informed the judge at a lobby conference that she had "spoke[n] with each of the victims regarding . . . excluding the press." *Id.*, at 48a. The prosecuting attorney indicated that the victims had expressed some "privacy concerns" that were based on "their own privacy interests, as well as the fact that there

Globe's request for relief was denied. Before Globe appealed to the full court, the rape trial proceeded and the defendant was acquitted.

Nine months after the conclusion of the criminal trial, the Supreme Judicial Court issued its judgment, dismissing Globe's appeal. Although the court held that the case was rendered moot by completion of the trial, it nevertheless stated that it would proceed to the merits, because the issues raised by Globe were "significant and troublesome, and . . . 'capable of repetition yet evading review.'" *Globe Newspaper Co.* v. *Superior Court*, 379 Mass. 846, 848, 401 N. E. 2d 360, 362 (1980), quoting *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911). As a statutory matter, the court agreed with Globe that § 16A did not require the exclusion of the press from the entire criminal trial. The provision was designed, the court determined, "to encourage young victims of sexual offenses to come forward; once they have come forward, the statute is designed to preserve their ability to testify by protecting them from undue psychological harm at trial." 379 Mass., at 860, 401 N. E. 2d, at 369. Relying on these twin purposes, the court concluded that § 16A *required* the closure of sex-offense trials only during the testimony of minor victims; during other portions of such trials, closure was "a matter within the judge's sound discretion." *Id.*, at 864, 401 N. E. 2d, at 371. The court did not pass on Globe's contentions that it had a right to attend the entire

---

are grandparents involved with a couple of these victims." *Ibid.* But according to the prosecuting attorney, the victims "wouldn't object to the press being included" if "it were at all possible to obtain a guarantee" that the press would not attempt to interview them or publish their names, photographs, or any personal information. *Ibid.* In fact, their names were already part of the public record. See 383 Mass. 838, 849, 423 N. E. 2d 773, 780 (1981). It is not clear from the record, however, whether or not the victims were aware of this fact at the time of their discussions with the prosecuting attorney.

criminal trial under the First and Sixth Amendments, noting that it would await this Court's decision—then pending— in *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S. 555 (1980).[6]

Globe then appealed to this Court. Following our decision in *Richmond Newspapers,* we vacated the judgment of the Supreme Judicial Court, and remanded the case for further consideration in light of that decision. *Globe Newspaper Co.* v. *Superior Court,* 449 U. S. 894 (1980).

On remand, the Supreme Judicial Court, adhering to its earlier construction of § 16A, considered whether our decision in *Richmond Newspapers* required the invalidation of the mandatory closure rule of § 16A. 383 Mass. 838, 423 N. E. 2d 773 (1981).[7] In analyzing the First Amendment issue,[8] the court recognized that there is "an unbroken tradition of openness" in criminal trials. *Id.,* at 845, 423 N. E. 2d, at 778. But the court discerned "at least one notable exception" to this tradition: "In cases involving sexual assaults, portions of trials have been closed to some segments of the public, even when the victim was an adult." *Id.,* at 846, 423

---

[6] Justice Quirico dissented, being of the view that the mandatory closure rule of § 16A was not limited to the testimony of minor victims, but was applicable to the entire trial.

[7] The court again noted that the First Amendment issue arising from the closure of the then-completed trial was " 'capable of repetition yet evading review.' " *Id.,* at 841, n. 4, 423 N. E. 2d, at 775, n. 4, quoting *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911). But in contrast to the view it had taken in its prior opinion, *supra,* at 600, the court held that the case was *not moot* because of this possibility of repetition without opportunity for review.

[8] The court found it unnecessary to consider Globe's argument that the mandatory closure rule violated the Sixth Amendment rights of the criminal defendant who had been acquitted in the rape trial. Those Sixth Amendment rights, the court stated, were "personal rights" that, "at least in the context of this case, [could] only be asserted by the original criminal defendant." 383 Mass., at 842, 423 N. E. 2d, at 776 (footnote omitted).

N. E. 2d, at 778.   The court also emphasized that § 16A's mandatory closure rule furthered "genuine State interests," which the court had identified in its earlier decision as underlying the statutory provision.   These interests, the court stated, "would be defeated if a case-by-case determination were used."   *Id.*, at 848, 423 N. E. 2d, at 779.   While acknowledging that the mandatory closure requirement results in a "temporary diminution" of "the public's knowledge about these trials," the court did not think "that *Richmond Newspapers* require[d] the invalidation of the requirement, given the statute's narrow scope in an area of traditional sensitivity to the needs of victims."   *Id.*, at 851, 423 N. E. 2d, at 781.   The court accordingly dismissed Globe's appeal.[9]

Globe again sought review in this Court.   We noted probable jurisdiction.   454 U. S. 1051 (1981).   For the reasons that follow, we reverse, and hold that the mandatory closure rule contained in § 16A violates the First Amendment.[10]

## II

In this Court, Globe challenges that portion of the trial court's order, approved by the Supreme Judicial Court of Massachusetts, that holds that § 16A requires, under all circumstances, the exclusion of the press and general public during the testimony of a minor victim in a sex-offense trial. Because the entire order expired with the completion of the rape trial at which the defendant was acquitted, we must consider at the outset whether a live controversy remains. Under Art. III, § 2, of the Constitution, our jurisdiction extends only to actual cases or controversies.   *Nebraska Press*

---

[9] Justice Wilkins filed a concurring opinion in which he expressed concern whether a statute constitutionally could require closure "without specific findings by the judge that the closing is justified by overriding or countervailing interests of the Commonwealth."   *Id.*, at 852, 423 N. E. 2d, at 782.

[10] We therefore have no occasion to consider Globe's additional argument that the provision violates the Sixth Amendment.

*Assn.* v. *Stuart,* 427 U. S. 539, 546 (1976). "The Court has recognized, however, that jurisdiction is not necessarily defeated simply because the order attacked has expired, if the underlying dispute between the parties is one 'capable of repetition, yet evading review.'" *Ibid.,* quoting *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S., at 515.

The controversy between the parties in this case is indeed "capable of repetition, yet evading review." It can reasonably be assumed that Globe, as the publisher of a newspaper serving the Boston metropolitan area, will someday be subjected to another order relying on § 16A's mandatory closure rule. See *Gannett Co.* v. *DePasquale,* 443 U. S. 368, 377–378 (1979); *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S., at 563 (plurality opinion). And because criminal trials are typically of "short duration," *ibid.,* such an order will likely "evade review, or at least considered plenary review in this Court." *Nebraska Press Assn.* v. *Stuart, supra,* at 547. We therefore conclude that the controversy before us is not moot within the meaning of Art. III, and turn to the merits.

## III

### A

The Court's recent decision in *Richmond Newspapers* firmly established for the first time that the press and general public have a constitutional right of access to criminal trials. Although there was no opinion of the Court in that case, seven Justices recognized that this right of access is embodied in the First Amendment, and applied to the States through the Fourteenth Amendment. 448 U. S., at 558–581 (plurality opinion); *id.,* at 584–598 (BRENNAN, J., concurring in judgment); *id.,* at 598–601 (Stewart, J., concurring in judgment); *id.,* at 601–604 (BLACKMUN, J., concurring in judgment).[11]

---

[11] JUSTICE POWELL took no part in the consideration or decision of *Richmond Newspapers.* But he had indicated previously in a concurring opin-

Of course, this right of access to criminal trials is not explicitly mentioned in terms in the First Amendment.[12] But we have long eschewed any "narrow, literal conception" of the Amendment's terms, *NAACP* v. *Button*, 371 U. S. 415, 430 (1963), for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights. *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 579–580, and n. 16 (plurality opinion) (citing cases); *id.*, at 587–588, and n. 4 (BRENNAN, J., concurring in judgment). Underlying the First Amendment right of access to criminal trials is the common understanding that "a major purpose of that Amendment was to protect the free discussion of governmental affairs," *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966). By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government. See *Thornhill* v. *Alabama*, 310 U. S. 88, 95 (1940); *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 587–588 (BRENNAN, J., concurring in judgment). See also *id.*, at 575 (plurality opinion) (the "expressly guaranteed freedoms" of the First Amendment "share a common core purpose of assuring freedom of communication on matters relating to the functioning of government"). Thus to the extent that the First Amendment embraces a right of access to crim-

---

ion in *Gannett Co.* v. *DePasquale*, 443 U. S. 368 (1979), that he viewed the First Amendment as conferring on the press a right of access to criminal trials. *Id.*, at 397–398.

[12] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U. S. Const., Amdt. 1.

inal trials, it is to ensure that this constitutionally protected "discussion of governmental affairs" is an informed one.

Two features of the criminal justice system, emphasized in the various opinions in *Richmond Newspapers*, together serve to explain why a right of access to *criminal trials* in particular is properly afforded protection by the First Amendment. First, the criminal trial historically has been open to the press and general public. "[A]t the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." *Richmond Newspapers, Inc.* v. *Virginia, supra,* at 569 (plurality opinion). And since that time, the presumption of openness has remained secure. Indeed, at the time of this Court's decision in *In re Oliver,* 333 U. S. 257 (1948), the presumption was so solidly grounded that the Court was "unable to find a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country." *Id.,* at 266 (footnote omitted). This uniform rule of openness has been viewed as significant in constitutional terms not only "because the Constitution carries the gloss of history," but also because "a tradition of accessibility implies the favorable judgment of experience." *Richmond Newspapers, Inc.* v. *Virginia, supra,* at 589 (BRENNAN, J., concurring in judgment).[13]

---

[13] Appellee argues that criminal trials have not always been open to the press and general public during the testimony of minor sex victims. Brief for Appellee 13–22. Even if appellee is correct in this regard, but see *Gannett Co.* v. *DePasquale, supra,* at 423 (BLACKMUN, J., concurring in part and dissenting in part), the argument is unavailing. In *Richmond Newspapers,* the Court discerned a First Amendment right of access to *criminal trials* based in part on the recognition that as a general matter criminal trials have long been presumptively open. Whether the First Amendment right of access to criminal trials can be restricted in the context of any particular criminal trial, such as a murder trial (the setting for the dispute in *Richmond Newspapers*) or a rape trial, depends not on the historical openness of that type of criminal trial but rather on the state interests assertedly supporting the restriction. See Part III–B, *infra.*

Second, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole.[14] Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.[15] And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.[16] In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

## B

Although the right of access to criminal trials is of constitutional stature, it is not absolute. See *Richmond Newspapers, Inc.* v. *Virginia, supra,* at 581, n. 18 (plurality opinion); *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 570. But the circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information,

---

[14] See *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S., at 569 (plurality opinion); *id.,* at 596–597 (BRENNAN, J., concurring in judgment); *Gannett Co.* v. *DePasquale,* 443 U. S., at 383; *id.,* at 428–429 (BLACKMUN, J., concurring in part and dissenting in part).

[15] See *Levine* v. *United States,* 362 U. S. 610, 616 (1960); *In re Oliver,* 333 U. S. 257, 268–271 (1948); *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S., at 570–571 (plurality opinion); *id.,* at 595 (BRENNAN, J., concurring in judgment); *Gannett Co.* v. *DePasquale, supra,* at 428–429 (BLACKMUN, J., concurring in part and dissenting in part).

[16] See *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S., at 570–571 (plurality opinion); *id.,* at 596 (BRENNAN, J., concurring in judgment); *Gannett Co.* v. *DePasquale,* 443 U. S., at 394 (BURGER, C. J., concurring); *id.,* at 428 (BLACKMUN, J., concurring in part and dissenting in part).

it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest. See, *e. g.*, *Brown* v. *Hartlage*, 456 U. S. 45, 53–54 (1982); *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 101–103 (1979); *NAACP* v. *Button*, 371 U. S., at 438.[17] We now consider the state interests advanced to support Massachusetts' mandatory rule barring press and public access to criminal sex-offense trials during the testimony of minor victims.

## IV

The state interests asserted to support § 16A, though articulated in various ways, are reducible to two: the protection of minor victims of sex crimes from further trauma and embarrassment; and the encouragement of such victims to come forward and testify in a truthful and credible manner.[18] We consider these interests in turn.

We agree with appellee that the first interest—safeguarding the physical and psychological well-being of a minor[19]—is a compelling one. But as compelling as that interest is, it

---

[17] Of course, limitations on the right of access that resemble "time, place, and manner" restrictions on protected speech, see *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 63, n. 18 (1976), would not be subjected to such strict scrutiny. See *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 581–582, n. 18 (plurality opinion); *id.*, at 598, n. 23 (BRENNAN, J., concurring in judgment); *id.*, at 600 (Stewart, J., concurring in judgment).

[18] In its opinion following our remand, the Supreme Judicial Court of Massachusetts described the interests in the following terms:

"(a) to encourage minor victims to come forward to institute complaints and give testimony . . . ; (b) to protect minor victims of certain sex crimes from public degradation, humiliation, demoralization, and psychological damage . . . ; (c) to enhance the likelihood of credible testimony from such minors, free of confusion, fright, or embellishment; (d) to promote the sound and orderly administration of justice . . . ; (e) to preserve evidence and obtain just convictions." 383 Mass., at 848, 423 N. E. 2d, at 779.

[19] It is important to note that in the context of § 16A, the measure of the State's interest lies not in the extent to which minor victims are injured by testifying, but rather in the incremental injury suffered by testifying *in the presence of the press and the general public.*

does not justify a *mandatory* closure rule, for it is clear that the circumstances of the particular case may affect the significance of the interest.   A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim.[20]   Among the factors to be weighed are the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim,[21] and the interests of parents and relatives.   Section 16A, in contrast, requires closure even if the victim does not seek the exclusion of the press and general public, and would not suffer injury by their presence.[22]   In the case before us, for example, the names of the minor victims were already in the public record,[23] and the record indicates that the victims

---

[20] Indeed, the plurality opinion in *Richmond Newspapers* suggested that individualized determinations are *always* required before the right of access may be denied: "Absent an overriding interest *articulated in findings*, the trial of a criminal case must be open to the public."   448 U. S., at 581 (footnote omitted) (emphasis added).

[21] "[I]f the minor victim wanted the public to know precisely what a heinous crime the defendant had committed, the imputed legislative justifications for requiring the closing of the trial during the victim's testimony would in part, at least, be inapplicable."   383 Mass., at 853, 423 N. E. 2d, at 782 (Wilkins, J., concurring).

[22] It appears that while other States have statutory or constitutional provisions that would *allow* a trial judge to close a criminal sex-offense trial during the testimony of a minor victim, no other State has a *mandatory* provision excluding both the press and general public during such testimony.   See, *e. g.*, Ala. Code § 12–21–202 (1975); Ariz. Rule Crim. Proc. 9.3; Ga. Code § 81–1006 (1978); La. Rev. Stat. Ann. § 15:469.1 (West 1981); Miss. Const., Art. 3, § 26; N. H. Rev. Stat. Ann. § 632–A:8 (Supp. 1981); N. Y. Jud. Law § 4 (McKinney 1968); N. C. Gen. Stat. § 15–166 (Supp. 1981); N. D. Cent. Code § 27–01–02 (1974); Utah Code Ann. § 78–7–4 (1953); Vt. Stat. Ann., Tit. 12, § 1901 (1973); Wis. Stat. § 970.03(4) (1979–1980).   See also Fla. Stat. § 918.16 (1979) (providing for mandatory exclusion of *general public* but not *press* during testimony of minor victims).   Of course, we intimate no view regarding the constitutionality of these state statutes.

[23] The Court has held that the government may not impose sanctions for the publication of the names of rape victims lawfully obtained from the pub-

may have been willing to testify despite the presence of the press.[24]   If the trial court had been permitted to exercise its discretion, closure might well have been deemed unnecessary.   In short, §16A cannot be viewed as a narrowly tailored means of accommodating the State's asserted interest: That interest could be served just as well by requiring the trial court to determine on a case-by-case basis whether the State's legitimate concern for the well-being of the minor victim necessitates closure.   Such an approach ensures that the constitutional right of the press and public to gain access to criminal trials will not be restricted except where necessary to protect the State's interest.[25]

Nor can §16A be justified on the basis of the Commonwealth's second asserted interest—the encouragement of minor victims of sex crimes to come forward and provide accurate testimony.   The Commonwealth has offered no empirical support for the claim that the rule of automatic closure contained in §16A will lead to an increase in the number of minor sex victims coming forward and cooperating with state authorities.[26]   Not only is the claim speculative in empirical

---

lic record.   *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975).   See also *Smith* v. *Daily Mail Publishing Co.,* 443 U. S. 97 (1979).

[24] See n. 5, *supra.*

[25] Of course, for a case-by-case approach to be meaningful, representatives of the press and general public "must be given an opportunity to be heard on the question of their exclusion." *Gannett Co.* v. *DePasquale,* 443 U. S., at 401 (POWELL, J., concurring).   This does not mean, however, that for purposes of this inquiry the court cannot protect the minor victim by denying these representatives the opportunity to confront or cross-examine the victim, or by denying them access to sensitive details concerning the victim and the victim's future testimony.   Such discretion is consistent with the traditional authority of trial judges to conduct *in camera* conferences.   See *Richmond Newspapers, Inc.* v. *Virginia, supra,* at 598, n. 23 (BRENNAN, J., concurring in judgment).   Without such trial court discretion, a State's interest in safeguarding the welfare of the minor victim, determined in an individual case to merit some form of closure, would be defeated before it could ever be brought to bear.

[26] To the extent that it is suggested that, quite apart from encouraging minor victims to testify, §16A improves the quality and credibility of testi-

terms, but it is also open to serious question as a matter of logic and common sense. Although § 16A bars the press and general public from the courtroom during the testimony of minor sex victims, the press is not denied access to the transcript, court personnel, or any other possible source that could provide an account of the minor victim's testimony. Thus § 16A cannot prevent the press from publicizing the substance of a minor victim's testimony, as well as his or her identity. If the Commonwealth's interest in encouraging minor victims to come forward depends on keeping such matters secret, § 16A hardly advances that interest in an effective manner. And even if § 16A effectively advanced the State's interest, it is doubtful that the interest would be sufficient to overcome the constitutional attack, for that same interest could be relied on to support an array of mandatory closure rules designed to encourage victims to come forward: Surely it cannot be suggested that minor victims of sex crimes are the *only* crime victims who, because of publicity attendant to criminal trials, are reluctant to come forward and testify. The State's argument based on this interest therefore proves too much, and runs contrary to the very foundation of the right of access recognized in *Richmond Newspapers:* namely, "that a presumption of openness inheres in the very nature of a criminal trial under our system of justice." 448 U. S., at 573 (plurality opinion).

## V

For the foregoing reasons, we hold that § 16A, as construed by the Massachusetts Supreme Judicial Court, vio-

---

mony, the suggestion also is speculative. And while closure may have such an effect in particular cases, the Court has recognized that, *as a general matter*, "[o]penness in court proceedings may *improve* the quality of testimony." *Gannett Co.* v. *DePasquale, supra,* at 383 (emphasis added). In the absence of any showing that closure would improve the quality of testimony of *all* minor sex victims, the State's interest certainly cannot justify a *mandatory* closure rule.

lates the First Amendment to the Constitution.[27]   Accordingly, the judgment of the Massachusetts Supreme Judicial Court is

*Reversed.*

JUSTICE O'CONNOR, concurring in the judgment.

In *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S. 555 (1980), the Court held that the First Amendment protects the right of press and public to attend criminal trials.   I do not interpret that decision to shelter every right that is "necessary to the enjoyment of other First Amendment rights." *Ante,* at 604.   Instead, *Richmond Newspapers* rests upon our long history of open criminal trials and the special value, for both public and accused, of that openness.   As the plurality opinion in *Richmond Newspapers* stresses, "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." 448 U. S., at 575.   Thus, I interpret neither *Richmond Newspapers* nor the Court's decision today to carry any implications outside the context of criminal trials.

This case, however, does involve a criminal trial.   Moreover, it involves a statute mandating automatic exclusion of the public from certain testimony.   As the Court explains, Massachusetts has demonstrated no interest weighty enough to justify application of its automatic bar to all cases, even those in which the victim, defendant, and prosecutor have no objection to an open trial.   Accordingly, I concur in the judgment.

---

[27] We emphasize that our holding is a narrow one: that a rule of mandatory closure respecting the testimony of minor sex victims is constitutionally infirm.   In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex-offense victims.   But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional.

CHIEF JUSTICE BURGER, with whom JUSTICE REHNQUIST joins, dissenting.

Historically our society has gone to great lengths to protect minors *charged* with crime, particularly by prohibiting the release of the names of offenders, barring the press and public from juvenile proceedings, and sealing the records of those proceedings. Yet today the Court holds unconstitutional a state statute designed to protect not the *accused*, but the minor *victims* of sex crimes. In doing so, it advances a disturbing paradox. Although states are permitted, for example, to mandate the closure of all proceedings in order to protect a 17-year-old charged with rape, they are not permitted to require the closing of part of criminal proceedings in order to protect an innocent child who has been raped or otherwise sexually abused.

The Court has tried to make its holding a narrow one by not disturbing the authority of state legislatures to enact more narrowly drawn statutes giving trial judges the discretion to exclude the public and the press from the courtroom during the minor victim's testimony. *Ante*, at 611, n. 27. I also do not read the Court's opinion as foreclosing a state statute which mandates closure except in cases where the victim agrees to testify in open court.[1] But the Court's deci-

_____

[1] It certainly cannot be said that the victims in this case consented to testifying in open court. During a lobby conference prior to trial, the prosecutor informed the trial judge that she had interviewed the victims, that they were concerned about publicity, and would agree to press attendance only if certain guarantees could be given:

"Each of [the three victims] indicated that they had the same concerns and basically they are privacy concerns.

"The difficulty of obtaining any kind of guarantee that the press would not print their names or where they go to school or any personal data or take pictures of them or attempt to interview them, those concerns come from their own privacy interests, as well as the fact that there are grandparents involved with a couple of these victims who do not know what hap-

sion is nevertheless a gross invasion of state authority and a state's duty to protect its citizens—in this case minor victims of crime. I cannot agree with the Court's expansive interpretation of our decision in *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555 (1980), or its cavalier rejection of the serious interests supporting Massachusetts' mandatory closure rule. Accordingly, I dissent.

## I

The Court seems to read our decision in *Richmond Newspapers, supra*, as spelling out a First Amendment right of access to all aspects of all criminal trials under all circumstances. *Ante*, at 605, n. 13. That is plainly incorrect. In *Richmond Newspapers*, we examined "the right of access to places traditionally open to the public" and concluded that criminal trials were generally open to the public throughout this country's history and even before that in England. The opinions of a majority of the Justices emphasized the historical tradition of open criminal trials. 448 U. S., at 564–573; *id.*, at 589–591 (BRENNAN, J., concurring in judgment); *id.*, at 599 (Stewart, J., concurring in judgment); *id.*, at 601 (BLACKMUN, J., concurring in judgment). The proper mode of analysis to be followed in determining whether there is a right of access was emphasized by JUSTICE BRENNAN:

pened and if they were to find out by reading the paper, everyone was concerned about what would happen then. And they stated that if it were at all possible to obtain a guarantee that this information would not be used, then they wouldn't object to the press being included. I explained that that is [a] very difficult guarantee to obtain because the Court cannot issue a conditional order, or anything like that, but I just wanted to put on the record what their concerns were and what they are afraid of." App. 48a.

It is clear that the victims would "waive" the exclusion of the press only if the trial court gave them guarantees of strict privacy, guarantees that were probably beyond the authority of the court and which themselves would raise grave constitutional problems. See *Oklahoma Publishing Co.* v. *District Court of Oklahoma County*, 430 U. S. 308 (1977); *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975).

"As previously noted, resolution of First Amendment public access claims in individual cases must be strongly influenced by the weight of historical practice and by an assessment of the specific structural value of public access in the circumstances." *Id.*, at 597–598.

Today JUSTICE BRENNAN ignores the weight of historical practice. There is clearly a long history of exclusion of the public from trials involving sexual assaults, particularly those against minors. See, *e. g., Harris* v. *Stephens*, 361 F. 2d 888 (CA8 1966), cert. denied, 386 U. S. 964 (1967); *Reagan* v. *United States*, 202 F. 488 (CA9 1913); *United States* v. *Geise*, 158 F. Supp. 821 (Alaska), aff'd, 262 F. 2d 151 (CA9 1958), cert. denied, 361 U. S. 842 (1959); *Hogan* v. *State*, 191 Ark. 437, 86 S. W. 2d 931 (1935); *State* v. *Purvis*, 157 Conn. 198, 251 A. 2d 178 (1968), cert. denied, 395 U. S. 928 (1969); *Moore* v. *State*, 151 Ga. 648, 108 S. E. 47 (1921), appeal dism'd, 260 U. S. 702 (1922).[2] Several States have long-standing provisions allowing closure of cases involving sexual assaults against minors.[3]

It would misrepresent the historical record to state that there is an "unbroken, uncontradicted history" of open proceedings in cases involving the sexual abuse of minors. *Richmond Newspapers, supra*, at 573. Absent such a history of openness, the positions of the Justices joining reversal in *Richmond Newspapers* give no support to the proposition that closure of the proceedings during the testimony of the minor victim violates the First Amendment.[4]

---

[2] Cf. *Stamicarbon, N.V.* v. *American Cyanamid Co.*, 506 F. 2d 532, 539–540 (CA2 1974), and cases cited therein.

[3] See, *e. g.*, Ala. Const., Art. VI, § 169 (1901) (repealed 1973); Fla. Stat. § 918.16 (1979); Ga. Code § 81–1006 (1978); Miss. Const., Art. 3, § 26; N. H. Rev. Stat. Ann. § 632–A:8 (Supp. 1981); N. Y. Jud. Law § 4 (McKinney 1968); N. C. Gen. Stat. § 15–166 (Supp. 1981); Utah Code Ann. § 78–7–4 (1953).

[4] It is hard to find a limiting principle in the Court's analysis. The same reasoning might require a hearing before a trial judge could hold a bench conference or any *in camera* proceedings.

## II

The Court does not assert that the First Amendment right it discerns from *Richmond Newspapers* is absolute; instead, it holds that when a "State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Ante*, at 606–607. The Court's wooden application of the rigid standard it asserts for this case is inappropriate. The Commonwealth has not denied the public or the media access to information as to what takes place at trial. As the Court acknowledges, Massachusetts does not deny the press and the public access to the trial transcript or to other sources of information about the victim's testimony. Even the victim's identity is part of the public record, although the name of a 16-year-old accused rapist generally would not be a matter of public record. Mass. Gen. Laws Ann., ch. 119, § 60A (West Supp. 1982–1983). The Commonwealth does not deny access to information, and does nothing whatever to inhibit its disclosure. This case is quite unlike others in which we have held unconstitutional state laws which prevent the dissemination of information or the public discussion of ideas. See, *e. g.*, *Brown* v. *Hartlage*, 456 U. S. 45 (1982); *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97 (1979); *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829 (1978); *Nebraska Press Assn.* v. *Stuart*, 427 U. S. 539 (1976); *Cox Broadcasting Corp.* v. *Cohen*, 420 U. S. 469 (1975); *NAACP* v. *Button*, 371 U. S. 415 (1963).

The purpose of the Commonwealth in enacting § 16A was to give assurance to parents and minors that they would have this moderate and limited protection from the trauma, embarrassment, and humiliation of having to reveal the intimate details of a sexual assault in front of a large group of unfamiliar spectators—and perhaps a television audience—and to lower the barriers to the reporting of such crimes which might come from the victim's dread of public testimony. *Globe Newspaper Co.* v. *Superior Court*, 379 Mass.

846, 865, 401 N. E. 2d 360, 372 (1980); 383 Mass. 838, 847–848, 423 N. E. 2d 773, 779 (1981).

Neither the purpose of the law nor its effect is primarily to deny the press or public access to information; the verbatim transcript is made available to the public and the media and may be used without limit. We therefore need only examine whether the restrictions imposed are reasonable and whether the interests of the Commonwealth override the very limited incidental effects of the law on First Amendment rights. See *Richmond Newspapers*, 448 U. S., at 580–581 (plurality opinion); *id.*, at 600 (Stewart, J., concurring in judgment); *Pell* v. *Procunier*, 417 U. S. 817 (1974); *Saxbe* v. *Washington Post Co.*, 417 U. S. 843 (1974); *Cox* v. *New Hampshire*, 312 U. S. 569 (1941). Our obligation in this case is to balance the competing interests: the interests of the media for instant access, against the interest of the State in protecting child rape victims from the trauma of public testimony. In more than half the states, public testimony will include television coverage.

## III

For me, it seems beyond doubt, considering the minimal impact of the law on First Amendment rights and the overriding weight of the Commonwealth's interest in protecting child rape victims, that the Massachusetts law is not unconstitutional. The Court acknowledges that the press and the public have prompt and full access to all of the victim's testimony. Their additional interest in actually being present during the testimony is minimal. While denying it the power to protect children, the Court admits that the Commonwealth's interest in protecting the victimized child is a compelling interest. *Ante*, at 607. This meets the test of *Richmond Newspapers, supra.*

The law need not be precisely tailored so long as the state's interest overrides the law's impact on First Amendment rights and the restrictions imposed further that interest. Certainly this law, which excludes the press and public only

during the actual testimony of the child victim of a sex crime, rationally serves the Commonwealth's overriding interest in protecting the child from the severe—possibly permanent—psychological damage. It is not disputed that such injury is a reality.[5]

The law also seems a rational response to the undisputed problem of the underreporting of rapes and other sexual offenses. The Court rejects the Commonwealth's argument that § 16A is justified by its interest in encouraging minors to report sex crimes, finding the claim "speculative in empirical terms [and] open to serious question as a matter of logic and common sense." *Ante*, at 609–610. There is no basis whatever for this cavalier disregard of the reality of human experience. It makes no sense to criticize the Commonwealth for its failure to offer empirical data in support of its rule; only by allowing state experimentation may such empirical evidence be produced. "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). See also *Chandler* v. *Florida*, 449 U. S. 560, 579–580 (1981); *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 441 (1980); *Whalen* v. *Roe*, 429 U. S. 589, 597, and n. 20 (1977).

The Court also concludes that the Commonwealth's assertion that the law might reduce underreporting of sexual offenses fails "as a matter of logic and common sense." This conclusion is based on a misperception of the Commonwealth's argument and an overly narrow view of the protection the statute seeks to afford young victims. The Court apparently believes that the statute does not prevent any sig-

---

[5] For a discussion of the traumatic effect of court proceedings on minor rape victims, see E. Hilberman, The Rape Victim 53–54 (1976); S. Katz & M. Mazur, Understanding the Rape Victim: A Synthesis of Research Findings 198–200 (1979), and studies cited therein.

nificant trauma, embarrassment, or humiliation on the part of the victim simply because the press is not prevented from discovering and publicizing both the identity of the victim and the substance of the victim's testimony. *Ante*, at 609–610. Section 16A is intended not to preserve confidentiality, but to prevent the risk of severe psychological damage caused by having to relate the details of the crime in front of a crowd which inevitably will include voyeuristic strangers.[6] In most states, that crowd may be expanded to include a live television audience, with reruns on the evening news. That ordeal could be difficult for an adult; to a child, the experience can be devastating and leave permanent scars.[7]

The Commonwealth's interests are clearly furthered by the mandatory nature of the closure statute. Certainly if the law were discretionary, most judges would exercise that discretion soundly and would avoid unnecessary harm to the child, but victims and their families are entitled to assurance of such protection. The legislature did not act irrationally in deciding not to leave the closure determination to the idiosyncracies of individual judges subject to the pressures avail-

---

[6] As one commentator put it: "Especially in cases involving minors, the courts stress the serious embarrassment and shame of the victim who is forced to testify to sexual acts or whose intimate life is revealed in detail before a crowd of the idly curious." Berger, Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom, 77 Colum. L. Rev. 1, 88 (1977). The victim's interest in avoiding the humiliation of testifying in open court is thus quite separate from any interest in preventing the public from learning of the crime. It is ironic that the Court emphasizes the failure of the Commonwealth to seal the trial transcript and bar disclosure of the victim's identity. The Court implies that a state law more severely encroaching upon the interests of the press and public would be upheld.

[7] See Hilberman, *supra;* L. Holmstrom & A. Burgess, The Victim of Rape: Institutional Reactions 222, 227 (1978); Berger, *supra,* at 88, 92–93; Libai, The Protection of the Child Victim of a Sexual Offense in the Criminal Justice System, 15 Wayne L. Rev. 977, 1021 (1969). Holmstrom and Burgess report that nearly half of all *adult* rape victims were disturbed by the public setting of their trials. Certainly the impact on children must be greater.

able to the media. The victim might very well experience considerable distress prior to the court appearance, wondering, in the absence of such statutory protection, whether public testimony will be required. The mere possibility of public testimony may cause parents and children to decide not to report these heinous crimes. If, as psychologists report, the courtroom experience in such cases is almost as traumatic as the crime itself,[8] a state certainly should be able to take whatever reasonable steps it believes are necessary to reduce that trauma. Furthermore, we cannot expect victims and their parents to be aware of all of the nuances of state law; a person who sees newspaper, or perhaps even television, reports of a minor victim's testimony may very well be deterred from reporting a crime on the belief that public testimony will be required. It is within the power of the state to provide for mandatory closure to alleviate such understandable fears and encourage the reporting of such crimes.

## IV

There is, of course, "a presumption of openness [that] inheres in the very nature of a criminal trial under our system of justice." But we have consistently emphasized that this presumption is not absolute or irrebuttable. A majority of the Justices in *Richmond Newspapers* acknowledged that closure might be permitted under certain circumstances. Justice Stewart's separate opinion pointedly recognized that exclusion of the public might be justified to protect "the sensibilities of a youthful prosecution witness . . . in a criminal trial for rape." 448 U. S., at 600, n. 5.[9] The Massachusetts statute has a relatively minor incidental impact on First

---

[8] See Bohmer & Blumberg, Twice Traumatized: The Rape Victim and the Court, 58 Judicature 390 (1975); Katz & Mazur, *supra;* Holmstrom & Burgess, *supra;* Hilberman, *supra;* Berger, *supra.*

[9] See also 448 U. S., at 580–581; *id.,* at 582 (WHITE, J., concurring); *id.,* at 584 (STEVENS, J., concurring); *id.,* at 598 (BRENNAN, J., concurring in judgment).

Amendment rights and gives effect to the overriding state interest in protecting child rape victims. Paradoxically, the Court today denies the victims the kind of protection routinely given to juveniles who commit crimes. Many will find it difficult to reconcile the concern so often expressed for the rights of the accused with the callous indifference exhibited today for children who, having suffered the trauma of rape or other sexual abuse, are denied the modest protection the Massachusetts Legislature provided.

JUSTICE STEVENS, dissenting.

The duration of a criminal trial generally is shorter than the time it takes for this Court's jurisdiction to be invoked and our judgment on the merits to be announced. As a result, our power to review pretrial or midtrial orders implicating the freedom of the press has rested on the exception to the mootness doctrine for orders "capable of repetition, yet evading review." See *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S. 555, 563; *Gannett Co.* v. *DePasquale,* 443 U. S. 368, 377–378; *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 546–547.

Today the Court expands that exception in order to pass on the constitutionality of a statute that, as presently construed, has never been applied in a live controversy. In this case, unlike the three cases cited above, the governing state law was materially changed after the trial court's order had expired by its own terms. There consequently is no possibility "'that the same complaining party will be subject to the same action again.'" *Gannett Co.* v. *DePasquale, supra,* at 377 (quoting *Weinstein* v. *Bradford,* 423 U. S. 147, 149).

The fact that the Massachusetts Supreme Judicial Court narrowly construed—and then upheld in the abstract—the state statute that the trial court had read to mandate the closure of the entire trial bears on our review function in other respects. We have only recently recognized the First

Amendment right of access to newsworthy matter. See *ante*, at 603; *Richmond Newspapers, Inc.* v. *Virginia, supra,* at 582 (STEVENS, J., concurring). In developing constitutional jurisprudence, there is a special importance in deciding cases on concrete facts. Cf. *Minnick* v. *California Dept. of Corrections,* 452 U. S. 105, 120–127; *United States* v. *Raines,* 362 U. S. 17, 21. Only in specific controversies can the Court decide how this right of access to criminal trials can be accommodated with other societal interests, such as the protection of victims or defendants. The advisory opinion the Court announces today sheds virtually no light on how such rights should be accommodated.

The question whether the Court should entertain a facial attack on a statute that bears on the right of access cannot be answered simply by noting that the right has its source in the First Amendment. See, *e. g., Bates* v. *State Bar of Arizona,* 433 U. S. 350, 380–381; *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 61. For the right of access is plainly not coextensive with the right of expression that was vindicated in *Nebraska Press Assn., supra.*[1] Because statutes that bear on this right of access do not deter protected activity in the way that other laws sometimes interfere with the right of expression, we should follow the norm of reviewing these statutes as applied rather than on their face.

It is not clear when, if ever, the Court will need to confront the question whether a mandatory partial-closure statute is unconstitutional. If the order hypothesized by the Supreme Judicial Court, instead of the trial court's order, had actually been entered in this case, and if the press had been given prompt access to a transcript of the testimony of the minor victims, appellant might not even have appealed. At the

---

[1] For example, even though a reporter may have no right of access to a judge's side-bar conference, it surely does not follow that the judge could enjoin publication of what a reporter might have learned about such a conference.

very least the press, the prosecutor, and defense counsel would have argued the constitutionality of the partial-closure order in the context of the facts relevant to such an order, and a different controversy would have been framed for appellate review. In future cases the trial courts may voluntarily follow the direction of Justice Wilkins and make specific findings demonstrating a compelling state interest supporting the mandated partial-closure order. See 383 Mass. 838, 852–853, 423 N. E. 2d 773, 782 (concurring opinion). Or the record in future cases may plainly disclose a justification for a partial closure that the Court would consider acceptable. Thus, aside from the illumination provided by live controversies, a decision to review only orders actually entered pursuant to the Massachusetts statute would advance the policy of avoiding the premature and unnecessary adjudication of constitutional questions;[2] it is at least conceivable that no such order may ever have to be justified by the conclusion of the legislature that the mandatory closure of the trial during the testimony of a minor victim of a sex crime is necessary to serve important state interests.

The Court does not hold that on this record a closure order limited to the testimony of the minor victims would have been unconstitutional. Rather, the Court holds only that if ever such an order is entered, it must be supported by adequate findings. Normally, if the constitutional deficiency is the absence of findings to support a trial order, the Court would either remand for factfinding, or examine the record itself, before deciding whether the order measured up to constitutional standards. The infeasibility of this course of action—since no such order was entered in this case and since the order that was entered has expired—further demon-

---

[2] "But the most fundamental principle of constitutional adjudication is not to face constitutional questions but to avoid them, if at all possible." *United States* v. *Lovett*, 328 U. S. 303, 320 (Frankfurter, J., concurring).

strates that the Court's comment on the First Amendment issues implicated by the Massachusetts statute is advisory, hypothetical, and, at best, premature.[3]

I would dismiss the appeal.

---

[3] The "capable of repetition, yet evading review" exception to the mootness doctrine generally is compatible with our settled policy of avoiding the premature adjudication of constitutional questions, see *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 756, n. 8, for an order that is capable of repetition yet evading review generally is no less ripe for review the first time it is presented than it would be on subsequent occasions. But when the "order" that is presented for review the first time is formulated in the abstract, as was the ruling of the Supreme Judicial Court in this case, the policy requires the Court to defer review of such an order until it is entered in a live controversy.