General William C. **WESTMORELAND, Plaintiff,**

v.

**CBS INC., et al., Defendants.**

**No. 82 Civ 7913 (PNL).**

United States District Court, S.D. New York.

Sept. 19, 1984.

---

**7.** It is also not "nonconviction information" because it is not criminal history record informa-

tion, as explained *infra.*

See also, D.C., 97 F.R.D. 703; D.C., 596 F.Supp. 1170.

Stuart F. Pierson, William E. Kennard, Andrew D. Koblenz, Verner, Liipfert, Bernhard & McPherson, Chartered, Washington, D.C., Robert G. Morvillo, Obermaier, Morvillo & Abramowitz, P.C., New York City, for petitioner Cable News Network, Inc., A Subsidiary of Turner Broadcasting, Inc.

## OPINION AND ORDER

LEVAL, District Judge.

Cable News Network (CNN) petitions for permission to record and distribute live comprehensive televised coverage of this trial. The petition recognizes that the introduction of cameras and recording equipment into a federal court proceeding is contrary to Canon 3 A(7) of the Code of Judicial Conduct for the United States Courts and local General Rule 7 of this Court. The petition requests an experimental exception for this case for the purposes (1) of demonstrating to the federal courts that such use of cameras will not impair or diminish the integrity and effectiveness of a judicial proceeding and (2) of distributing (on a pooled basis) comprehensive coverage of a trial that raises profoundly important questions concerning this country's conduct of the war in Vietnam and the privileges, ethical responsibilities and liabilities of the press. All parties to the case support the application.

My training in the long accepted tradition that banished the camera from the federal courtroom produced an instinctive negative reaction. I have been taught to assume that cameras would turn trials into vaudeville. A more careful reading of the petition, however, reveals a powerful argument.

There was a time when the blanket exclusion of the camera from the courtroom was understandable and appropriate. Equipment was cumbersome and noisy. Film could not function indoors without either the popping of flash bulbs or glaring stage lights. Television was a novelty, geared toward low-brow entertainment, It was easy, and no doubt justified, to conclude that the intrusion of the camera would disrupt and pervert the orderly conduct of the serious business of courts. Today, much has changed. Cameras are small, noiseless and equipped with distance lenses. Modern technology has made film that is sensitive to ordinary indoor light, and sound recording is similarly advanced. It appears that filming can be done without the slightest obstruction of dignified, orderly court procedure.

Although in 1965 the Supreme Court concluded that television coverage of a criminal proceeding was incompatible with due process, *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, Justice Harlan opined that "the day may come when television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process." 381 U.S. at 595, 85 S.Ct. at 1666.

History has shown that Justice Harlan wrote these words with characteristic foresight. More and more states gradually

adopted rules permitting telecasting of court proceedings. In 1981 the Supreme Court ruled in *Chandler v. Florida,* 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740, that absent a showing of prejudice, the telecasting of a criminal proceeding did not infringe constitutional rights.

Since *Chandler,* the trend toward opening courtrooms to cameras and telecasting has accelerated. It appears from CNN's petition that 41 of the 50 states now permit live filmed coverage of court proceedings, generally under rules designed to insure that fair and orderly administration of justice is not impaired. The Code of Judicial Conduct governing the federal courts, however, has made no concession.

On consideration of this petition, I have come to question the wisdom of the categorical ban imposed by our code.

1. The experience of a multitude of states has shown that under appropriate rules preserving the court's control over the use of cameras, live filming and telecasting need not interfere in any degree with fair and orderly administration of justice. A single, silent, fixed-location camera is no more intrusive than the familiar phenomena of courtroom artists working on their sketches and notetaking reporters making entrances and hasty exits to phone in their stories on deadline.

2. I need not consider here whether there may be instances in which live telecasting might create pressures capable of prejudicing the outcome of a trial. Assuming for argument that this is a reasonable, if rare, possibility, it is sufficient answer for cases presenting such dangers to be dealt with as they arise. As the Supreme Court noted in *Chandler, supra* at 574–75, 101 S.Ct. at 809–10, the possible importance of excluding cameras from some cases is not a reason to exclude them from all cases.

Here all parties wish the proceedings to be telecast. It is certainly not to protect them that cameras are excluded.

3. *Chandler* and the experience of 41 states has laid to rest the question wheth-er, in the absence of prejudice, telecasting offends the Constitution. I would venture that the question courts will find more troublesome in the future is whether the mandatory exclusion of the camera violates the litigant's (and perhaps the public's) right to a public trial. *But see United States v. Hastings,* 695 F.2d 1278 (11th Cir.1983). The Supreme Court has recently reaffirmed the importance of the constitutional principles requiring court proceedings to be held in public view, absent the most compelling reasons to the contrary. See *Waller v. Georgia,* —— U.S. ——, 104 S.Ct. 2210, 81 L.Ed.2d 31, (1984) (Sixth Amendment right to public trial encompasses suppression hearing); *Press-Enterprise Co. v. Superior Court,* —— U.S. ——, 104 S.Ct. 819, 78 L.Ed.2d 629, (1984) (voir dire examination of potential jurors covered by guarantees of public trial); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (state statute cannot exclude press and public from testimony of minor victim of sex crimes without case-by-case determination that compelling interests of the state require exclusion). The question then arises whether good reasons must also be found for restricting the means of public access and the types of media coverage—especially where the restriction effectively precludes the public at large from gaining any meaningful acquaintance with the conduct of court business.

I would think it a strong argument on the part of a litigant—especially in the type of case that arouses strong public interest—that he depends on the monitoring presence of the camera to insure that witnesses tell the truth and that the court does not influence the jury by gesture, expression and tone. See *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 383, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979) (openness in court proceedings may improve quality of testimony and cause all participants to perform duties more conscientiously).

4. The public's legitimate interest in obtaining the information it would receive is beyond dispute. Courts play a vital role in

American life, in adjudicating civil disputes sometimes affecting the rights of huge classes, trying criminal indictments and interpreting the laws of the land. The people should have the opportunity to see how the courts function.

That opportunity effectively does not exist today. Of course, the doors of the courthouse are open, but people are busy, and judicial proceedings are time consuming. Generally a trial which takes 2 full weeks to conduct could be fairly condensed into one or two hours of informative film.

Apart from the public interest in familiarity with the general conduct of courts, the subject matter of this trial is of the most serious public importance. Among the questions in dispute will be whether the high U.S. military command in Vietnam engaged in willful distortion of intelligence data to substantiate optimistic reports on the progress of the war and whether one of the nation's most important distributors of news and commentary engaged in willful or reckless slander. It can be expected that the trial will go beyond the particulars of those two inquiries into issues of appropriate standards for both military commanders and press commentators.

The public interest is thus not the mere voyeurism that emerges for a sensational murder trial. It is a response to a rare debate and inquiry on issues of highest national importance.

It could even be reasonably argued that the filming of this trial is more important than its decision: historians and commentators on the war and on the press will not accept the verdict of the jury and the rulings of the judge as definitive answers. They will seek lessons and conclusions by analysis of the witnesses' testimony. The verdict may settle liability as between the parties; but it is unlikely to settle anything for anyone else. Most certainly it will not settle the historical and ethical debates exposed by this action.

5. Finally, I believe it is very much in the interest of the federal judiciary to admit the camera into its proceedings. We are told that the public today holds judges in rather low esteem. We are assumed to be lazy, biased and venal. Recognizing that I do not qualify as a neutral observer, I am persuaded that this view of the federal judiciary is seriously mistaken. Perhaps this results from lack of public familiarity with court proceedings.

Since long before I joined their ranks, I have held federal judges in high esteem; all that I have seen of my colleagues since I joined them has confirmed my admiration. What I have seen is federal judges working long, hard hours with diligence and an unfailing conviction to fairness, determined to run their courts in pursuit of justice. Their remuneration is small compared to what they could easily earn in private life. With the rarest of exceptions (that have been prominently reported in the recent press), their integrity is beyond question. In the more than 20 years that I have worked as a lawyer and later a judge in the New York federal courts, I have never heard so much as a rumor affecting the integrity of a single judge of that bench.

I believe in sum that the federal judges are on the whole an admirable bunch who little deserve the low esteem in which they are held by public reputation. I suggest that the gap between the reality and the perception results largely from the fact that the public has little opportunity to see how scrupulously, how painstakingly and how fairly federal judges conduct court business. Repeatedly, we receive letters from jurors expressing their admiration for what they have observed in the course of their jury service. But the general public, which does not see the federal courts in action, harbors a different image.

Would it not be better for us to adopt rules that will occasionally permit the public to see us at our work and to judge for themselves.

6. I think it a safe prediction that the eventual entry of the camera into the federal courtroom is inevitable, whether this year, in five years or in ten. In the meantime, do we wish to adopt a stance of two

feet firmly rooted in the past? Do we wish to hold back the clock by order and fiat?

\* \* \*

In my view the petition should be granted for reasons explained above, but the rules of the Judicial Conference and of this court are to the contrary.

Believing that I have no discretion in the matter in the face of those rules, I deny the application, in spite of its merit.

SO ORDERED: