OPINION OF THE COURT
John W. Grow, J.
In this CPLR article 78 proceeding petitioner The Herald Company, Inc., seeks judgment as follows: (1) vacating and prohibiting enforcement of respondents’ determination to exclude petitioner’s representatives from the final parole revocation hearing of a certain Hubert Allen which was to have been held May 28, 1985 in Syracuse, New York; (b) "invalidating and nullifying all policies, procedures, rules and regulations which purport to deny Petitioner access to and the right to freely attend either preliminary or final [parole] revocation hearings at any time in the future”; and (c) "enjoining the State of New York, the Board of Parole and the employees of either in the Division of Parole or elsewhere from excluding press or public from any future hearings.”
Although the issue of exclusion of petitioner’s representa *37 tives from Mr. Allen’s parole revocation hearing is now moot,[1] the court addresses the significant issue of access of the public and press[2] to parole revocation hearings since it is likely to recur and yet typically will evade review. (Matter of Herald Co. v Weisenberg, 59 NY2d 378, 381.)
Petitioner advances two main arguments in support of its contention that respondents’ policy of closing parole revocation hearings to the public and press under all circumstances should be invalidated and nullified: (1) The policy violates US Constitution 1st and 14th Amendments;[3] and (2) the policy contravenes the public policy of the State of New York, as explicated in Weisenberg (supra). We note at the outset that respondents’ policy is not embodied in any written rule or regulation. Rather it is our understanding that respondents have orally expressed their policy of blanket closure to petitioner’s representatives.
A parole revocation proceeding is initiated by the lodging of a detention warrant pursuant to Executive Law § 259-i (3) (a). Executive Law § 259-i (3) (c) (i) provides, in pertinent part, that "Within fifteen days after the warrant for retaking and temporary detention has been executed, unless the releasee has been convicted of a new crime committed while under his present parole or conditional release supervision, the board of parole shall afford the alleged parole or conditional release violator a preliminary revocation hearing before a hearing officer designated by the board of parole.” At the preliminary hearing, the alleged violator has the right to present evidence in his own behalf and the right to confront and cross-examine the witnesses against him. (Executive Law § 259-i [3] [c] [iii], *38 [v].) In addition, adverse witnesses may be compelled to attend the preliminary hearing. (Executive Law § 259-i [3] [c] [iii].) The standard of proof at the preliminary hearing is "probable cause to believe that the parolee or conditional releasee has violated one or more conditions of his parole or conditional release in an important respect.” (Executive Law § 259-i [3] [c] [iv].)
If the hearing officer makes a finding of probable cause, a so-called "final” revocation hearing may be held within 90 days of the probable cause determination. (Executive Law § 259-i [3] [d], [f] [i].) At the final revocation hearing, the alleged violator is allowed to be represented by counsel and, if he cannot afford counsel, he is entitled to court-assigned counsel. (Executive Law § 259-i [3] [f] [v].) The alleged violator has the right to plead to the charges; to confront and cross-examine adverse witnesses; and to present witnesses and documentary evidence in his defense and on the issue of the appropriateness of reincarceration. (Executive Law § 259-i [3] [f] [v], [vi].) The standard of proof at the final revocation hearing is "a preponderance of the evidence”. (Executive Law § 259-i [3] [f] [viii].) If the presiding officer finds that the charge is supported by a preponderance of the evidence, the violator may be reincarcerated, placed in a parole transition facility for 180 days, or restored to supervision. (Executive Law § 259-i [3] [f] [x].)[4]
1ST AMENDMENT
Although the United States Supreme Court has not yet squarely addressed the issue of whether the public and press have a 1st Amendment right of access to parole revocation hearings, several recent decisions in the context of criminal trials provide guidance for our constitutional inquiry.
In Richmond Newspapers v Virginia (448 US 555), the *39 United States Supreme Court held that the press and general public have a constitutional right under the 1st and 14th Amendments to attend criminal trials.[5] In the plurality opinion, Chief Justice Burger quoted with approval Jeremy Bentham’s observation concerning the value of open justice: " 'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance.’ 1 J. Bentham, Rationale of Judicial Evidence 524 (1827).” (Supra, at p 569.) The Chief Justice noted that "in the administration of criminal justice, the means used to achieve justice must have the support derived from public acceptance of both the process and its results.” (Supra, at p 571.) Chief Justice Burger reviewed the "historical evidence” which, he concluded, "demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open.” (Supra, at p 569.) The Chief Justice also analyzed the reasons behind this history of open trials: "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing. When a criminal trial is conducted in the open, there is at least an opportunity both for understanding the system in general and its workings in a particular case” (supra, at p 572).
Although no explicit provision in the Constitution affords protection against exclusion of the press and public from criminal trials, the Chief Justice concluded that "the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.’ Branzburg, 408 U. S., at 681.” (Supra, at p 580.) The Chief Justice emphasized that the unarticulated right to attend criminal trials is implicit in the enumerated guarantees of free speech and free press. (Supra, at pp 575-577.) The Chief Justice concluded that "Absent an overriding interest articulated in findings, the trial of a criminal case must be open to the public.” (Supra, at p 581.)
*40 In his concurring opinion in Richmond (supra), Justice Brennan set forth not only the historical analysis employed by Chief Justice Burger in the plurality opinion, but also a structural analysis in which he analyzed the function of the 1st Amendment in preserving free and open public discussion of governmental affairs: "[T]he First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a structural role to play in securing and fostering our republican system of self-government * * * Implicit in this structural role is not only 'the principle that debate on public issues should be uninhibited, robust, and wide-open,’ New York Times Co. v. Sullivan, 376 U. S. 254, 270 (1964), but also the antecedent assumption that valuable public debate — as well as other civic behavior— must be informed. The structural model links the First Amendment to that process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself, but also for the indispensable conditions of meaningful communication.” (Supra, at pp 587-588.) Justice Brennan asserted that at least two questions must be asked when deciding whether to open a governmental process to the public and the press: (1) Does history reveal a tradition of accessibility and (2) is access to the governmental process "important in terms of that very process”? (Supra, at p 589.) Justice Brennan concluded that "resolution of First Amendment public access claims in individual cases must be strongly influenced by the weight of historical practice and by an assessment of the specific structural value of public access in the circumstances.” (Supra, at pp 597-598.) Justice Brennan emphasized that one major function of the trial is to demonstrate "the fairness of the law to our citizens” (p 594): "Secrecy is profoundly inimical to this demonstrative purpose of the trial process. Open trials assure the public that procedural rights are respected, and that justice is afforded equally. Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law. Public access is essential, therefore, if trial adjudication is to achieve the objective of maintaining public confidence in the administration of justice” (supra, at p 595). Justice Brennan noted that "the conduct of the trial is preeminently a matter of public interest” (p 596) and concluded that "Popular attendance at trials, in sum, substantially furthers the particular public purposes of that critical judicial proceeding.” (Supra, at p 597.)
In Globe Newspaper Co. v Superior Ct. (457 US 596), the *41 Supreme Court held that a Massachusetts statute which mandated closure of a trial during the testimony of a minor victim of sexual assault violated the 1st Amendment, as applied to the States through the 14th Amendment. Justice Brennan, who delivered the opinion for the court, employed the same historical and structural analysis as he had set forth in his concurring opinion in Richmond (supra). However, for purposes of the analysis in the present case — where there is no proof that parole revocation hearings have historically been open to the public and press — it is significant to note, as did the dissent in Globe, that a purely historical approach would have led the court to a different result. The historical analysis in Globe revealed that, although criminal trials had historically been open to the press and public, there was, as the Supreme Judicial Court of Massachusetts had found, a "notable exception” to this tradition in cases involving sexual assaults, where portions of the trials have long been closed to some segments of the public.[6] Justice Brennan, eschewing a purely historical analysis, emphasized once again the structural role of open access to criminal trials: "[T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience.” (Supra, at p 606.)
In Globe (supra) the State of Massachusetts argued that it had a compelling governmental interest in protecting a minor *42 victim of sexual assault from the trauma of testifying before the press and general public. The court agreed that safeguarding the physical and mental well-being of a minor victim was a compelling State interest, but held that where a compelling governmental interest necessitated denial of access, it must be shown that such denial "is narrowly tailored to serve that interest”. (Supra, at p 607.) The court concluded that the Massachusetts statute was not narrowly tailored to serve the compelling State interest in protecting the welfare of minor victims: "In short, § 16A cannot be viewed as a narrowly tailored means of accommodating the State’s asserted interest: That interest could be served just as well by requiring the trial court to determine on a case-by-case basis whether the State’s legitimate concern for the well-being of the minor victim necessitates closure. Such an approach ensures that the constitutional right of the press and public to gain access to criminal trials will not be restricted except where necessary to protect the State’s interest.” (Supra, at p 609.)
In Press-Enterprise Co. v Superior Ct. of Cal. (464 US 501), the Supreme Court held that the voir dire examination of potential jurors is presumptively open to the public and press: "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.” (Supra, at p 510.)
The court held that in deciding a motion for closure of voir dire proceedings, the trial court must weigh the asserted privacy rights of prospective jurors against the historic rights of the press and public to attend such proceedings under the 1st and 14th Amendments. The court warned that even if it is found that closure is warranted, the trial court must consider whether alternatives other than closure are available to protect the interests of the prospective jurors.[7]
*43 In his concurring opinion in Press-Enterprise Co. (supra) Justice Stevens emphasized that the court’s decision was based upon the role of the 1st Amendment in the process of self-government: "The constitutional protection for the right of access that the Court upholds today is found in the First Amendment, rather than the public trial provision of the Sixth. If the defendant had advanced a claim that his Sixth Amendment right to a public trial was violated by the closure of the voir dire, it would be important to determine whether the selection of the jury was a part of the ‘trial’ within the meaning of that Amendment. But the distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issues. Nor is our holding premised simply on our view as to how a criminal trial is most efficaciously conducted. For the question the Court decides today — ‘whether the voir dire process must be open — focuses on First * * * Amendment values and the historical backdrop against which the First Amendment was enacted’ ” (supra, at pp 516-517; emphasis added).[8]
Respondents contend that Richmond, Globe and Press-Enterprise Co. (supra) do not mandate invalidation of their closure policy on constitutional grounds since parole revocation hearings are neither the equivalent of criminal trials nor posttrial proceedings as such. An analysis of the nature of the parole revocation process is therefore essential to a determination of the public’s interest in parole revocation hearings and their concomitant constitutional right of access to those hearings.
In considering the issue of whether the 14th Amendment requirements of due process apply to the parole system, the Supreme Court in Morrissey v Brewer (408 US 471, 480) noted that parole revocation is not part of the criminal prosecution: "We begin with the proposition that the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations * * * Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions.” Nevertheless, al *44 though the court did not in any sense equate the parole revocation process to a criminal prosecution, the court did find that the interest of a parolee in his continued liberty requires that he be afforded certain due process procedural protections during the parole revocation process:
"We turn to an examination of the nature of the interest of the parolee in his continued liberty. The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.
"We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts 'grievous loss’ on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee’s liberty is a 'right’ or a 'privilege’. By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.” (Supra, at pp 481-482.)
The court in Morrissey (supra) made an observation concerning society’s interest in the parole revocation process which is particularly apposite to the issue in the instant case: "The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions * * * And society has a further interest in treating the parolee with basic fairness: fair treatment in *45 parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness.” (Supra, at p 484.)
The parolee does not, of course, have the same status as a defendant in a criminal trial, since the defendant is a presumptively innocent citizen whereas the parolee is a convicted criminal who has been granted conditional freedom in lieu of further incarceration. Nevertheless, this difference in status does not negate the public’s interest in gaining access to the parole revocation hearing. As Justice Stevens noted in his dissenting opinion in Houchins v KQED, Inc. (438 US 1, 37), the public interest in the trial "survives the judgment of conviction and appropriately carries over to an interest in how the convicted person is treated during his period of punishment and hoped-for rehabilitation.”
Thus, respondents miss the mark when they assert that "the agreement between the parolee and the Board of Parole to abide by the conditions of parole represents a private matter between the Board of Parole and the parolee.”[9]
The public has a legitimate interest in the conduct of parole revocation hearings, since those hearings deal with issues of crime and punishment which touch the lives of all citizens. It is not idle curiosity which leads us to scrutinize the process whereby a parolee who has evinced dangerous propensities while free on parole may be granted the freedom to strike again. Nor is it simply voyeurism which leads us to watch closely the workings of a process which lets criminals free among us in order to rehabilitate them and then reincarcerates those who violate the conditions placed upon that freedom. Although respondents are correct in noting that parole revocation hearings are neither the equivalent of criminal trials nor posttrial proceedings as such, the cases dealing with the 1st Amendment right of access in the context of criminal *46 trials are relevant to the present inquiry because much of the structural rationale underlying the decisions in those cases would apply — although, perhaps, with somewhat less force — to parole revocation hearings.[10] (See, Press-Enterprise Co. v Superior Ct. of Cal., 464 US 501, Stevens, J., dissenting opn, supra.) Indeed, the Third Circuit has explicitly held that the 1st Amendment secures to the public and press a right of access to civil proceedings. (Publicker Indus. v Cohen, 733 F2d 1059 [3d Cir 1984].) Despite the fact that there is no evidence that parole revocation hearings have historically been open to the public and press, access to the parole revocation process is "important in terms of that very process” (Richmond Newspapers v Virginia, 448 US 555, 589 [Brennan, J., concurring opn], supra). At a time when the merits of the parole process are being hotly debated, [11] the "structural value of public access” (supra, at p 598) can scarcely be doubted. By opening parole revocation hearings to the public and press, the free, open and informed discussion of the parole process would be furthered. The time has come for parole revocation hearings to be exposed to "the salutary scrutiny of the public and the press” (Press-Enterprise Co. v Superior Ct. of Cal., supra, at p 521 [Marshall, J., concurring opn]).
Respondents argue that public dissemination of the transcript of a parole revocation hearing is barred by Executive Law § 259-k (2) and 9 NYCRR 8000.5, and contend that the parole revocation hearing must therefore also be shielded from public view. Even assuming, for the sake of argument, that Executive Law § 259-k (2) and 9 NYCRR 8000.5 do bar the release of transcripts, respondent’s argument is unconvincing for two reasons: (1) any such prohibition must be strictly construed (see, e.g., Matter of Herald Co. v Weisenberg, 59 NY2d 378, 382, supra); and (2) the constitutionality of a statute or regulation which imposes a blanket prohibition on the release of transcripts may itself be subject to serious question, for the reasons enunciated herein. Indeed, it has been suggested that affording the public and press access to transcripts may effectively accommodate 1st Amendment interests even in cases where the hearings themselves are closed *47 to the public and press. (See, e.g., Press-Enterprise Co. v Superior Ct. of Cal., supra, at p 517; Matter of Gannett Co. v De Pasquale, 43 NY2d 370, 381.)
Respondents also contend that "the underlying purpose of the entire parole process, the reformation and reintegration of the parolee, will be seriously jeopardized by public access to parole revocation hearings. Such publicity will call down derision by members of the public on the parolee and may impede a parolee’s ability to hold or find employment. This publicity will also frustrate the duty of Division of Parole to reintegrate parolees into the community.” Respondents point to the fact that "the parolee may be found not to have been in violation of his conditions or, even if a violation is sustained, the Board of Parole has discretion not to reincarcerate the releasee.”
In a rather peculiar argument, respondents further contend that the danger of public misunderstanding of parole revocation hearings is an additional ground for closure: "Also, it is important to note that the burden of proof at parole revocation hearings is proof by a preponderance of the evidence. It is easy to imagine that the general public, if made aware of parole proceedings, will not understand the difference between finding that there has been a parole violation and conviction of a crime. Such a misconception would further impair the ability of the Division of Parole to rehabilitate parolees.”
Respondents do not cite any statute which embodies a legislative determination that mandatory closure is essential to furtherance of the goals of rehabilitation and reintegration. Respondents also fail to present any expert opinion or empirical evidence which would support their contention that a mandatory closure rule is necessary for the effective rehabilitation and reintegration of parolees.
Even if respondents’ asserted grounds for closure are viewed as compelling (and many of them are far from compelling), they do not justify a policy of mandatory closure under all circumstances.
Respondents’ argument that compelling State interests justify a rule providing for mandatory closure of parole revocation hearings under all circumstances ignores the 1st Amendment access and information gathering rights of the press and public. If the State believes in a given case that a compelling governmental interest warrants closure of the parole revocation hearing, it can make a motion addressed to the hearing *48 officer for closure. The hearing officer can then weigh the significance of the asserted governmental interest against the 1st Amendment right of access of the public and press. As the court pointed out in Globe (457 US 596, supra), the fact that the State asserts compelling governmental interests favoring closure does not justify a mandatory closure rule, since "the circumstances of the particular case may affect the significance of the interest.” (Globe Newspaper Co. v Superior Ct., supra, at p 608.) In the instant case, respondents’ policy would require closure even if the parolee "does not seek the exclusion of the press and general public, and would not suffer injury by their presence.” (Supra.) Indeed, the parolee whose revocation process gave rise to the present proceeding allegedly sought to have the press present at his revocation hearing. The 1st Amendment requires that the hearing officer determine on a case-by-case basis whether a compelling interest necessitates closure and whether that interest could be accommodated by measures other than closure. If the hearing officer finds that closure is warranted, his closure order must be narrowly tailored to serve the asserted State interest. (See, Press-Enterprise Co. v Superior Ct. of Cal., supra, at p 514.)[12]
WEISENBERG
In Weisenberg (supra, p 380) the Court of Appeals held that "[a]n unemployment insurance hearing is presumed to be open, and may not be closed to the public unless there is demonstrated a compelling reason for closure and only after *49 the affected members of the news media are given an opportunity to be heard.” The Weisenberg court based its decision on "the strong public policy in this State of public access to judicial and administrative proceedings.” (Supra, at p 381.) The Weisenberg court did not consider the issue of whether the closure order violated the 1st Amendment, since that constitutional claim was not raised at the trial level (p 381, n). Rather, the court based its holding upon the public policy of the State, as expressed in various statutes such as the Freedom of Information Law: "This policy has found expression through legislative language in a variety of contexts (see, e.g., Judiciary Law, § 4, Public Officers Law, §§ 84, 95).” (Supra.) The court held that the fact that compelling reasons may justify closure in certain circumstances does not justify a mandatory closure rule: "To the extent that such compelling reasons may exist for making certain information confidential, however, less drastic remedies than closing a hearing in its entirety exist. Although an unemployment compensation hearing is not a criminal judicial proceeding, the procedures outlined with respect to such proceedings are apt (see Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 442, supra). When a claimant or employer requests closure of an unemployment compensation hearing during the presentation of certain evidence, he or she must demonstrate that a compelling reason exists for such closure * * * If the administrative law judge does find a compelling reason for closure, such reason shall be stated on the public record in as much detail as would be consistent with the reason for closure. And equally important, no hearing should be closed before affected members of the news media are given an opportunity to be heard 'in a preliminary proceeding adequate to determine the magnitude of any genuine public interest’ in the matter (Matter of Gannett Co. v De Pasquale, 43 NY2d 370, 381, affd 443 US 368).” (Supra, at p 383.)
The legitimate interest of the public and the press in parole revocation hearings is at least as great as any interest that could be shown in unemployment compensation hearings. Weisenberg (supra) thus mandates that the public policy of this State favors open parole revocation hearings in the absence of compelling reasons justifying closure. Weisenberg also requires that the hearing officer may close a parole revocation hearing only after affected members of the news media are given an opportunity to be heard on the issue of closure.
In view of the court’s disposition on 1st Amendment and *50 public policy grounds, we find it unnecessary to reach the merits of the remaining claims raised by the parties.
Respondents erred in summarily excluding petitioner’s representatives from the parole revocation hearing without allowing petitioner an opportunity to be heard on a motion before the hearing officer and in the absence of a finding by the hearing officer that compelling reasons existed for closure. The policies, procedures, rules and regulations of the Board of Parole concerning mandatory closure of parole revocation hearings are hereby invalidated and nullified, and the State of New York is hereby enjoined from enforcing any such policies, procedures, rules and regulations. Motions for closure should be addressed to the hearing officer and affected members of the news media and the public must be given an opportunity to be heard. If the hearing officer finds that compelling reasons exist which would warrant closure, he should state on the record the basis for that finding; should inquire whether alternatives other than closure are available; and should close only so much of the hearing as is necessary to accommodate the asserted compelling interests.[13]

. Counsel have informed the court that Mr. Allen’s hearing has been held. In addition, counsel have indicated that Mr. Allen has been indicted by the Grand Jury and is being held pending trial.

. The United States Supreme Court has held that the press does not have a constitutional right of access to information not available to the general public. (Pell v Procunier, 417 US 817, 834; Saxbe v Washington Post Co., 417 US 843, 850.) The court’s decision in the instant case does not hinge upon any possible distinction between the right of access of the press and that of the general public, and, for purposes of this opinion, they are regarded as equivalent. Nevertheless, we note the vital role which the press plays in our democratic process of self-government, for the press can gather and disseminate information which the average citizen, left to his own devices, would never acquire. See the concurring opinion of Judge Fuchsberg in Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430).

. The 14th Amendment makes the 1st Amendment applicable to abridgement of speech and press by the States. (See, e.g., Nebraska Press Assn. v Stuart, 427 US 539.)

. As noted above, the parole revocation process is governed by provisions of the Executive Law. The parolee at a parole revocation hearing has many of the same kinds of rights as an accused at a criminal trial. For example, the parolee has the right to confront and cross-examine adverse witnesses. However, the statute places restrictions on a parolee’s rights at a parole revocation hearing which are not applicable in the context of a criminal trial. For example, although the parolee has a presumptive right to confront adverse witnesses, that right is not absolute, and the hearing officer may dispense with the need for confrontation of the adverse witness if he finds that there is good cause to do so. (See, e.g., People ex rel. McGee v Walters, 62 NY2d 317.)

. There was no opinion of the court in Richmond Newspapers v Virginia (448 US 555). Chief Justice Burger delivered the plurality opinion.

. Indeed, Chief Justice Burger, in his dissent, accused Justice Brennan of failing to recognize the significance of this historical exception: "Today Justice Brennan ignores the weight of historical practice. There is clearly a long history of exclusion of the public from trials involving sexual assaults, particularly those against minors”. (Globe Newspapers v Superior Ct., 457 US 596, 614.) The Chief Justice argued that in the absence of an "unbroken, uncontradicted history” of openness in cases involving sexual abuse of minors, there was no support for the court’s conclusion that closure of the trial during the testimony of a minor victim of sexual assault violates the 1st Amendment. (Supra.)

. Obviously, there are limits to the access rights of the public and press: "Just as a government may impose reasonable time, place, and manner restrictions upon the use of streets in the interest of such objectives as the free flow of traffic * * * so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial.” (Richmond Newspapers v Virginia, supra, at p 581, n 18 [plurality].) Since Richmond, some courts have held that the right to a fair trial justifies limitations on the right of the public and press to gather information. (See, e.g., Sacramento Bee v United States Dist. Ct., 656 F2d 477 [9th Cir 1981].)

. See also, Judge Fuchsberg’s concurring opinion in Matter of Westchester Rockland Newspapers v Leggett (supra, at pp 448-454), in which Judge Fuchsberg took the position that the public and the press have a 1st Amendment right to attend pretrial competency hearings in criminal cases.

. The court notes that two bills have recently been passed which reveal a legislative determination that parole is not a "private” matter between the parolee and the Board of Parole. A new section 149-a has been added to the Correction Law, providing that a victim of a violent felony has a right to be notified of the fact that her assailant has been released on parole. The other bill (1) amends Executive Law § 259-i (2) (c) to provide that an additional factor to be considered in making the parole release decision is the written statement of the victim or the victim’s representative; and (2) amends CPL 440.50 (1) to provide that the District Attorney, in notifying the crime victim of the disposition of a case in which the defendant is sentenced to the custody of the Department of Correctional Services, must provide notice to the victim of her right to submit a written victim impact statement to the State Division of Parole.

. The court is mindful of Justice O’Connor’s interpretation that neither Richmond Newspapers (supra) nor Globe Newspaper Co. (supra) "carry any implications outside the context of criminal trials” (Globe Newspaper Co. v Superior Ct., supra, at p 611 [O’Connor, J., concurring opn]).

. See, e.g., Note, New York’s System of Indeterminate Sentencing and Parole: Should It Be Abolished?, 13 Fordham Urb LJ 395 (1984-1985).

. Respondents contend that allowing the press access to Mr. Allen’s parole revocation hearing would substantially prejudice his right to a fair trial by allowing public dissemination of evidence concerning acts upon which both parole revocation and possible criminal prosecution would be based. Although, as noted above, the issue of closure of Mr. Allen’s hearing is now moot, we take the opportunity to observe that a hearing officer may well decide that solicitude for the fair trial rights of a parolee warrants closure in certain cases where the parole revocation hearing will entail disclosure of evidence which could prejudice the parolee’s rights in a pending or imminent prosecution. For example, evidence may be received at a parole revocation hearing which would be inadmissible at a criminal trial. Where public dissemination of such inadmissible evidence would seriously jeopardize the parolee’s right to a fair trial in a pending or imminent prosecution, closure may be warranted. (See, e.g., Matter of Gannett Co. v De Pasquale, 43 NY2d 370, affd 443 US 368; (Matter of Poughkeepsie Newspapers v Rosenblatt, 92 AD2d 232.) Of course, in deciding a motion by a parolee for closure based upon fair trial grounds the hearing officer must bear in mind that the hearing is presumptively open to the public and press and must follow the guidelines set forth in this opinion.

. Of course, even in cases where the public and press must be permitted access, the hearing officer may impose reasonable "time, place and manner” restrictions. (See, e.g., United States v Yonkers Bd. of Educ., 747 F2d 111, 114 [2d Cir 1984]; Westmoreland v Columbia Broadcasting Sys., 752 F2d 16, 25 [2d Cir 1984, Winter, J., concurring opn].)