Larkin, J.
This case raises issues concerning a putative right of access to certain pre-trial papers generated in connection with a prospective criminal proceeding. It involves the always delicate attempt to' accommodate the competing interests of the public’s “Right to Know” with a defendant’s right to a criminal trial devoid of unwarranted and corrosive prejudicial pre-trial publicity. The factual context from which these issues arise is as follows:
Early in July 1987, one Kenneth Phoenix was arrested and charged with murder in the Town of Beichertown. Prior to the arrest, a search warrant was issued by a judge of the Superior Court on July 3, 1987. The warrant and affidavit were returned to the Ware District Court where they presently remain on file. On July 10,1987, the District Court judge on her own motion ordered the affidavit impounded. Neither the District Attorney’s office nor the defendant had requested impoundment.
In due course, and in accordance with the procedure set forth in Ottaway Newspapers, Inc. v. Appeals Court, 372 Mass. 539, 551 (1977), the plaintiff *66 newspaper commenced the present action seeking access to the affidavit. The District Court held an expedited hearing at which the defendant (Phoenix) supported the impoundment position. On August 10,1987, the Court issued a comprehensive Memorandum of Decision concluding that the Order of Impoundment was valid.
The Court’s Decision of August 10,1987 made detailed findings, setting forth the factual basis, and the Court’s reasoning in support of its Order. These findings of fact are unchallenged here on appeal. In essence, the findings of fact showed that on August 4, 1986, Raymond A. Green, a supervisory employee at Belchertown State School, was murdered on the school campus. Kenneth Phoenix, an employee at Belchertown State School, was charged with the murder on July 6,1987.
Belchertown is a rural community in Hampshire County. The murder and the arrest of the defendant Phoenix, following a year of intensive investigation had been covered in numerous newspaper articles and newscasts. Interest in the events of the murder and the resultant charge against the defendant Phoenix was great in the community.
The affidavit supporting the search warrant, which was issued on July 3, 1987, is a sixteen page document with statements, descriptions and allegations gathered during the almost one year investigation of the murder. The officer who presented the affidavit to the Court gathered the information contained therein from numerous and varied sources in the usual course of the criminal investigation. The affidavit was presented as support for a request for a search warrant, which, obviously, requires a level of proof considerably less than that required of evidence presented in a criminal trial. The nature of investigatory information such as contained in the affidavit is such that it may be suppressed or deemed prejudicial in pre-trial motion proceedings.
Following these factual findings, the trial court concluded that to disseminate the investigatory information contained in the affidavit to the public as a “judicial document” on which a judge had made a decision to issue a search warrant would give an incorrect and improper status to said information. In the trial court’s view: “fairness would require such dissemination to carry a complex commentary on the different standards of proof used in judicial proceedings and careful caution regarding admissibility of evidence in criminal trials. Such disclaimers would confuse the public and be impossible to monitor.”
The Court recognized that an open trial with the public being informed of all aspects of the trial is a constitutionally protected right. However, the Court further concluded that this right would not be diminished by witholding, during the pendency of the trial, investigatory material which may or may not be ultimately admitted as evidence in the trial. In the Court’s view: “if less than all of the information in the affidavit is admitted into evidence, the public will have access to the remainder when the case is completed.”
It was central to the trial court’s rationale that the right to a fair trial requires that a court protect a defendant’s right to be judged by a standard of proof beyond a reasonable doubt, and that the court serve as a facilitator for information received under a lesser standard. The court ultimately concluded that the trial is the mechanism for judicial fact finding and that in light of the defendant’s constitutional right to a fair trial, “justice requires impoundment of the affidavit during the pendency of this case.”
In turning to a consideration of the issues raised by this record, the first question, contested by the parties, is whether the search warrant and accompanying affidavit should be viewed as a “public record” as that term has *67 come to be defined in Massachusetts law. In addressing this issue, the starting point must be Mass. G.L. c.276, § 2B which provides in pertinent part: “Upon the return of said warrant the affidavit shall be attached to it and shall be filed therewith and it shall not be a public document until the warrant is returned.”
A review of the legislature history of this statute discloses that the above language was adopted by St. 1964, c.557, § 3 and has remained unchanged since its adoption. On the face of its text, the statute seems to provide that once the actual search has been conducted and the warrant returned to the Court, the warrant and supporting affidavit become public documents. In purport too, a like conclusion seems compelled. In effect, the language of the statute recognizes the public nature of the documents but protects the investigation and search by restricting public access until the search has been completed and the warrant returned to the Court. As the plaintiff argues, in this way the investigation will not be impaired until it is completed.
Moreover, the “public nature” of the affidavit and warrant does not rest entirely upon the above statute. Even without such a statute, in appropriate circumstances, the courts of this country have long recognized a generalized right to inspect and copy public records and documents, including judicial records and documents. See, e.g., Nixon v. Warner Communications, Inc., 435 U.S. 589, 597; 55 L.Ed.2d 570, 579 (1978); United States v. Criden, 648 F.2d 814 (3rd Cir. 1981); United States v. Myers, 635 F.2d 945 (2d Cir. 1980). Indeed, in United States v. Mitchell, 551 F.2d 1252, 1258 (D.C. Cir. 1976) rev'd. on other ground sub nom. Nixon v. Warner Communications, supra, the Court of Appeals for the District of Columbia emphasized the principle that the common law right to inspect and copy judicial records is fundamental in a democracy. Other courts have suggested that the right to inspect and copy (right of access) antedates the Constitution. See, e.g., United States v. Criden, 648 F. 2d at 819 (Abscam Case); United States v. Mitchell, 551 F.2d at 1260.
In Sibley v. Holyoke Transcript-Telegram Publishing Co., Inc., 391 Mass. 468 (1984) the Supreme Judicial Court held that the issuance of a search warrant, whether by a judge or a clerk, involves the exercise of judicial discretion and constitutes a “judicial proceeding.” Id. at 471. See also Thompson v. Globe Newspaper Co., 279 Mass. 176 (1932); Thompson v. Boston Publishing Co., 285 Mass. 344 (1934) concerning arrest warrants and supporting affidavits; and Cowley v. Pulsifer, 137 Mass. 392, 394 (1884) (Holmes, J.). Although Sibley, supra, concerned an action for libel and not access, the Court’s central rationale is relevant here. The Court, in holding that a publisher had a qualified privilege to report judicial proceedings, stated:
This qualified privilege is justified not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself.. .as to the mode in which a public duty is discharged (citing Cowley v. Pulsifer, 137 Mass. 392, 394 (1884). . .the purpose of the privilege is to ensure that publications may perform the important function of informing the public of actions taken by the Courts. Sibley, supra at 471-472.
As a starting point, then, it cannot be gainsaid that the affidavit is a part of the generic judicial proceeding. It is the very basis upon which the Court issued the search warrant. Accordingly, in our view, both the operative statute and relevant case law compel the conclusion that a search warrant and affidavit are “public records,” to which the public and the press have historically been entitled to access, in appropriate circumstances. Obviously, whether the *68 circumstances are “appropriate” is whether the disclosure of the contents of the affidavit would likely affect the prospects of the defendant to a fair trial. In effect, then, to conclude, as we do that the affidavit is indeed a “public record” is not to automatically conclude that impoundment of such a record is outside the sound discretion of the trial Court.
In this regard, there is no doubt that, as a general proposition, impoundment is within the authority of the District Court. “It is within the discretion of a court to impound its files in a case and to deny public inspection of them, and that is often done when justice so requires.” H.S. Gere & Sons, Inc. v. Frey, 400 Mass. 326, 329 (1987). Or, as was stated in another context: “Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes.” Nixon v. Warner Communications, Inc. 435 U.S. 589, 598 (1978). See also, New Bedford Standard-Times Publishing Co. v. Clerk of the Third District Court of Bristol, 377 Mass. 404, 410 (1979); Ottaway Newspapers, Inc. v. Appeals Court, 372 Mass. 539, 546 (1977); Uniform Rules on Impoundment Procedure (1986).
Having determined that the affidavit is a “public record” but also having concluded that a trial court has the inherent right to exercise its discretion, in appropriate circumstances, to safeguard the prospective trial from harmful external influences, we turn, then, to an examination of the relevent precedents to determine how and in what circumstances discretion is properly exercised in this area.
Despite this nation’s historical commitment to “openness” and to a generalized “right to know” actuated by First Amendment imperatives, until very recently the United States Supreme Court repeatedly rejected arguments claiming a constitutional right of access to information within governmental (including judicial) control. Then, in 1980, in the seminal case of Richmond Newspapers, Inc. v. Virginia, the Supreme Court, for the first time, recognized the public’s right of access to criminal trials.[2]
In the Richmond Newspapers case, seven members of the Court agreed that there was a first amendment right to attend criminal trials.[3] However, because six of these Justices submitted separate opinions,[4] the central rationale of the Court remained unclear.
In his opinion for the Court, Chief Justice Burger relied in part on the “political” theory of the first amendment.[5] He explained that some right of access protection is needed if the first amendment is to fulfill its “core purpose” of providing information on issues related “to the functioning of government.”[6] He found this to be especially true in the criminal trial context, because, in his view, no aspect of government is “of higher concern and importance to the people than the manner in which criminal trials are conducted.”[7] The Chief Justice, however, did not rely solely on this political argument to justify the right of access. He also invoked what Justice Blackmun called a “veritable *69 potpourri”[8] of constitutional guarantees, including the first amendment right of assembly,[9] the ninth amendment,[10] and the “penumbra” of the Bill of Rights.[11] Underlying all of these, Chief Justice Burger said, is the “presumption of openness” of criminal trials resulting from the long historical tradition of access to such proceedings.[12]
In a concurring opinion which became the foundation for subsequent decisions in this area, Justice Brennan based the right of access to government-controlled information squarely on the political theory of the first amendment. He wrote that an informed citizenry is “necessary for a democracy to survive,”[13] and that to ensure that information flows to the public, the first amendment must provide a right of access to government information.[14] Conceding that the scope of such a right is “theoretically endless,”[15] Justice Brennan proposed “two helpful principles to aid in setting practical limits on access rights.[16]
First, Justice Brennan stated that a right of access claim is stronger where there is a tradition of openness to the particular proceeding or information at issue.[17] Second, he proposed that access be granted whenever it furthers the functioning or purposes of the particular process involved.[18] He then found both of these factors to be present in the context of criminal trials.[19] Justice Brennan therefore concluded that only a “compelling” government interest could outweigh the right of access to trials.[20]
The Court’s next right of access case originating here in the Commonwealth, decided in 1982 was Globe Newspaper v. Superior Court.[21] In that case, the Court, in a majority opinion written by Justice Brennan struck down a Massachusetts law requiring judges to exclude from the press and the public from the courtroom during the testimony of minors who were alleged victims of a sex offense.[22] Justice Brennan relied on his reasoning in Richmond Newspapers, stating that the right of access is grounded in the core first amendment purpose of ensuring that citizens can “effectively participate in and contribute to our republican system of self-government.”[23] In the course of his opinion for the majority, Justice Brennan explicitly adverted to the “two helpful principles" he had articulated in Richmond Newspapers. He emphasized that the protection of a right of access implicit in the first amendment is explained and enhanced by the tradition of openness associated with the proceeding and by the role that such access could contribute to the *70 functioning of the criminal trial process.
Although Justice Brennan’s opinion indicated that the two principles, “tradition of openness” and “contribution to function,” were simply “helpful” concepts, the opinion seemed to imply that the principles were the bases or the necessary preconditions for a right of access to criminal trials. Indeed, after Globe, some lower courts began using “tradition” and “contribution to function” as a two-pronged standard for determining whether there was a right of access to government proceedings or information.[24]
Other language in Justice Brennan’s opinion, however, cast doubt on the importance of these two principles. It had been the position of the Commonwealth of Massachusetts in Globe that the requisite “tradition of openness” was not present in the case because criminal trials had historically been closed during the testimony of minors who were sex crime victims.[25] Justice Brennan rejected this argument, saying that access to a particular trial did not depend on the historical openness of the type of trial involved. This, together with the-explicit basing of the right of access in first amendment political theory, led some courts to treat “tradition” and “contribution to function” as mere factors to be considered in evaluating right of access claims.[26] Thus, it could be argued that the standard for determining when a right of access exists was still uncertain after Globe.
The Globe decision did, however, establish the test for assessing government attempts to limit access rights where they do exist. Government restrictions are subject to the traditional first amendment “strict scrutiny” standard: the right of access could be outweighted only by a “compelling governmental interest” and the denial had to be “narrowly tailored to serve that interest.”[27] The use of the strict scrutiny standard seemingly served to emphasize the Court’s inarticulate major premise that the right of access is a first amendment right.
In Press-Enterprise Co. v. Superior Court (Press-Enterprise I),[28] decided two years later, the Supreme Court found a right of access to voir dire proceedings in a criminal case. This was the first time that the Court recognized a right of access to a proceeding other than a formal criminal trial. The opinion for the majority did not discuss the constitutional basis of this right of access, but instead turned directly to a discussion of the “tradition of openness” and “contribution to function” principles.[29] After finding that both of these factors were present, the Court recognized a right of access to voir dire proceedings and declared that government attempts to deny this right had to meet Globe’s strict scrutiny standard.[30]
The majority’s reference to “tradition” and “contribution to function” seemed to provide further confirmation of the importance of these factors. Nonetheless, the opinion did not explicitly state that these two factors were *71 “prerequisites” to a right of access. Indeed, evidence of historical tradition was referred to merely as “helpful” to that determination. And this approach lent some support to lower court arguments that “tradition” and “contribution to function” were just two of the many factors to be weighed in evaluating a right of access claim.[31]
The uncertainty of precise rationale left by Press-Enterprise I was exacerbated by Waller v. Georgia.[32] In Waller, a unanimous Court found that a defendant’s sixth amendment right to a public trial had been violated when a pretrial suppression hearing had been closed to the press and public. Although the Court did not rule on the petitioner’s first amendment claim, the opinion seemed to imply that there was a right of access to suppression hearings.[33] Not only did this suggest an expansion of the right of access, it did so without discussing the “tradition of openness” factor that was so important in Globe and Press-Enterprise I. Justice Powell’s opinion focused instead on the importance of the public interest in such hearings. As suggested above, Waller thus further confused the standard for evaluating right of access claims.
In its latest “right to know” case, Press-Enterprise Co. v. Superior Court (Press-Enterprise II),[34] the Supreme Court seemingly announced the definitive standard for determining whether there is a right of access to government-controlled information. In this decision, the Court seemingly established the following standard. The reviewing court must first decide whether the “proceeding” to which access is sought meets the “tests of experience and logic.”[35] These tests are the two helpful principles that Justice Brennan first articulated in Richmond Newspapers. Under this formulation there must be a history and tradition of access to the proceeding,[36] and this “access” must be deemed to play a “significant positive role in the functioning of the particular process in question.[37] The Court indicated that if the proceeding at issue passes these tests, then a “qualified” first amendment right of access attaches.[38]
Once a “qualified” right of access is established, a reviewing court must then decide whether that right can be restricted.[39] To resolve this issue a court must apply the “strict scrutiny” test set out in Globe and Press-Enterprise I. this means that the right of access can only be restricted if is outweighed by an “overriding” public interest and if the denial of that access is narrowly tailored *72 to promote that interest.
With the foregoing as a broad organic scaffolding of the conceptual framework established by United States Supreme Court precedent, we turn again to the present record.
As a general principle, and as a matter of precedent and logic, it seems clear to us that the first amendment right of access to criminal trials, so carefully adumbrated by the Supreme Court in the foregoing cases, applies equally to those facets of the criminal process which in normal course, precede the formal criminal trial.
For example, it has been held that the first amendment right of access applies to pretrial hearings. See, United States v. Brooklier, 685 F.2d 1162, 1170 (9th Cir. 1983). Assuming that this principle has been established, there is no basis in logic to seek to distinguish between pretrial proceedings and the very documents which may generate the hearing and supply its procedural genesis and context in the teleological continuum of the criminal process.
Again, it can be well argued that the essential raison d’etre for a first amendment right of access to criminal proceedings has a conspicuous relevance to pretrial documents. Those justifications are: “(f)irst, the criminal trial historically has been open to the press and general public,” and “(s)econd, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole.” Globe Newspaper Co. v. Superior Court, supra, 102 S.Ct.2613, 2619-20 (1982).
It is now beyond dispute that the press and public have historically had a common law right of access to most pretrial documents, see, e.g., Nixon v. Warner Communications, Inc. 435 U.S. 589, 597-98 (1978). Moreover, it requires little imagination to recognize that certain pretrial documents, in appropriate contexts and circumstances, are frequently important to a more complete and cohesive understanding of the way in which “the judicial process and the government as a whole” are functioning. In sum, logic, precedent and experience reinforce the conclusion that the public and press have a first amendment right of access to pretrial documents — including, documents such as the focus of this case — an affidavit grounding a search warrant.
It is equally clear that where, as on the present record, it is asserted that the first amendment’s putative right of access conflicts with a defendant’s sixth amendment right to a fair trial, the party seeking the sealing of documents must establish that the procedure “is strictly and inescapably necessary in order to protect the fair-trial guarantee.” Brooklier, supra at 1167 (quoting Gannet Co. v. DePasquale, 443 U.S. 368 (1979) (Blackmun, J. concurring). In effect, this means that there must be a substantial probability that irreparable damage to a defendant’s fair-trial right will result if the document at issue is not sealed. In this context, as in all other facets of the criminal justice process, we must be scrupulous less we reverse, overtly or tacitly, that “presumption of openness” which must characterize criminal proceedings “under our system of justice,” Richmond Newspaper, Inc. v. Virginia, supra at 573 (plurality opinion). See also, Globe Newspaper Co., supra at 2633.[41]
Having recognized and validated the “presumption of openness” that must characterize criminal proceedings, it remains to be said that the protection of the defendant’s right to a fair trial is undeniably a governmental interest sufficient to warrant impoundment as a general proposition. As the United States Supreme Court has stated: “No right ranks higher than the right of the *73 accused to a fair trial.” Press-Enterprise Co. v. Superior Court, supra at 508 (1984).
In Gannett Co. v. DePasquale, 443 U.S. 368 (1979), the Supreme Court emphasized the importance of the defendant’s right to a fair trial in the context of a media claim of access:
This Court has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial. (Citations omitted). To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pre-trial publicity. (Citation omitted). And because of the Constitution’s pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.
Publicity concerning pre-trial suppression hearings such as the one involved in the present case poses special risks of unfairness. The whole purpose of such hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the- jury. (Citation omitted). Publicity concerning the proceedings at the pre-trial hearing, however, could influence public opinion against the defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.
.. .Closure of pre-trial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such information throughout the community before the' trial itself has even begun.
443 U.S. at 378-79. These observations apply with equal force tó search warrant affidavits in a ease, such as this one, which is highly publicized in a community of rural cast and context, where, according to the findings of the trial judge “(I)nterest in the events of the murder and the resultant charge against the defendant Phoenix was great.” (emphasis supplied).
Perhaps the situation would be different if we were dealing with a large, extended “megatropolis.” See, e.g. Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 565, where the United States Supreme Court took account of the broad geographic and demographic venue of the arena in which the putative prejudicial publicity might arise as a sufficiently insulating and deflecting condition. There the court stated: “in a large metropolitan area such as Los Angeles, with its millions of potential jurors, it is unlikely that ‘searching questions of prospective jurors x x x’ and ‘the use of emphatic and clear instructions’ will fail to produce an unbiased jury,'regardless of the nature of the pretrial documents filed.” In short, what might pass muster in the sweep and scope of a Los Angeles clearly would, as the trial judge found here, generate unsettled doubts and grave concerns that violence might be done to basic concepts of fair trial in the more languid, bucolic, innerleaning venues, of rural Belchertown.
Here we are satisfied that an extremely conscientious trial judge was justified in concluding that there was a substantial threat to the defendant’s fair trial rights — a conscientious, trial judge who sought to reach for and accommodate the fair balance between the sometimes conflicting interests which arise in the course of assuring a fair and public trial. Where the threat to the defendant’s fair trial right is established — as we conclude that it was here — the trial judge was well within her authority to conclude that justice *74 did require the impoundment of the affidavit pending trial.
Our review of the record persuades us that the trial judge was justified in concluding that there was at least the danger of intense and pervasive pretrial publicity concerning this case if the contents of the affidavit were released in advance of trial. Accordingly, she could also reasonably conclude, based on common human experience, that this adverse notoriety might well impair the defendant’s right to a fair trial. See, Nebraska Press Ass’n v. Stuart, 427 U.S. at 562-563. What emerges clearly from the detailed findings of the trial judge is that her review of the contents of the affidavit convinced her that broad and unguided dissemination of its contents, in advance of trial, might indeed create a risk that pretrial news accounts based on the contents of the affidavit, true or false, would have some adverse impact on the attitudes of those who might be called as jurors.'
In this regard, the words of Gannett Co. v. DePasquale, supra, have a telling relevance:
At the same time, I do not deny that the publication of information learned in an open proceeding may harm irreparably, under certain circumstance, the ability of a defendant to obtain a fair trial. This is especially true in the context of a pre-trial hearing, where disclosure of information, determined to be inadmissible at trial, may severely affect a defendant’s rights. Although the Sixth Amendment’s public-trial provision establishes a strong presumption in favor of open proceedings, it does not require that all proceedings be held in open court when to do so would deprive a defendant of a fair trial. 443 U.S. at 439.
We fully recognize and validate the importance and centrality of the constitutional guarantee of freedom of the press, not merely as an aid to the media in its varied shapes and forms, but, more fundamentally, as a benefit for all the people. We fully appreciate that a broadly defined freedom of the press assures the maintenance of our political system of democracy, social equality, and public exposure. Indeed, it can well be argued, as Camus has recognized, that the unique strength of America, different from any nation in the world, resides in its openness.[42] All of that having been said, it is clear that the right of public access to the judicial process ends only where the defendant’s right to trial by an impartial jury is unalterably threatened. In sum, “(Although the right of access to criminal trials is of constitutional stature, it is not absolute.” Globe Newspaper Co. v. Superior Court, 102 S.Ct. 2613, 2620 n. 17. It seems to us that the Globe court made it crystal clear that neither the first amendment nor the Sixth gives either the press, the public (or a defendant) the right to pre-empt or superimpose their views on the traditional discretion of a trial judge to assess the quotient of putative prejudicial publicity inherent in any document or other matter and the inevitable resultant radiations and ramifications on the judicial process.
Our review of the cases in this area makes clear that the right of “fair trial” is companion, not servant, to the constitutional guarantee of public trial. A defendant’s individual stake in it is to be protected and, at least, accorded as much.deference as that of other elements of society. And, just as clearly, atrial judge, in appropriate circumstances, has a duty to extend and vindicate that *75 protection to the full extent of its discretion. A trial judge surely must reinforce the important rights of public and press under the First Amendment. But the judge, where the circumstances warrant, cannot be seen as disregarding the dangers of adverse publicity on the premise — tacit or overt — that adverse pretrial publicity really is not of much consequence — a conclusion antithetical to the real life lessons of criminal trials or the actual experience of trial lawyers.
In short, in this area, as in so many other aspects of the administration of justice, drawing the least restrictive line is an essential function of the judicial process. In this case, we believe that a conscientious trial judge has exercised her discretion to draw that line faithful to the requisite constitutional balancing and in her detailed finding has underscored, found and articulated the reasons for her judgment. In sum, we believe that in a valid exercise of discretion, she has achieved a fair balance of the sometimes conflicting interests which arise in the course of assuring a “fair” as well as “public” trial.
Accordingly, we believe that the Report should be dismissed. An Order will enter in accordance with the Opinion.

Court members themselves recognized the importance of this decision. Justice Stevens stated, ‘This is a watershed case. Until today the Court has accorded virtually absolute protection to the dissemination of information of ideas, but never before has it squarely held that the acquisition of newsworthy matter is entitled to any constitutional protection whatsoever.” Id. at 582 (Stevens, J., concurring).

Justice Rehnquist was the sole dissenter. See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 604-06 (1980) (Rehnquist, J., dissenting). Justice Powell did not participate in the case.

See id. at 558-81 (Burger, C.J., plurality opinion); id. at 584-98 (Brennan, J., concurring); id. at 598-601 (Stewart, J., concurring); id at 601-04 (Blackmun, J., concurring in the judgment).

See Richmond Newspapers, 448 U.S. at 575-77.

Id. at 575.

Id.

Id. at 603 (Blackmun, J., concurring in the judgment).

See id. at 577-78. Chief Justice Burger suggested that the trial courtroom could be considered a “public place.” Id. at 578.

See id. at 579 n.15.

See id. at 579-80. Chief Justice.Burger compared the right to attend criminal trials to such penumbral guarantees as the right of association and the right of privacy. See id.

Id. at 573. Chief Justice Burger stressed the fact that a tradition of access to trials existed at English common law, and was firmly in place in this country at the time the Bill of Rights was adopted. See id. at 564-75. The Chief Justice relied on this factor to distinguish the earlier “right of access” cases.

Id. at 588 (Brennan, J., concurring).

See id. at 587-88.

Id. at 588 (quoting Brennan, Address, 32 Rutgers L. Rev. 173, 176 (1979). Justice Brennan noted that the access right could be invoked not only to support demands for any and all sorts of government information, but to challenge virtually any government restriction on private actions, because “(t)here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.” Id. (quoting Zamel v. Rusk, 381 U.S. 1, 16-17 (1965)).

Id. at 589.

See id.

See id.

Justice Brennan, like Chief Justice Burger, noted the long tradition of access to trials.

Id. at 598.

 457 U.S. 596 (1982)

Id. at 610-11

Id. at 604

See, e.g., United States v. Chagra, 701 F.2d 354, 363 (5th Cir. 1983) (“the lack of an historic tradition...does not bar...a right of access"); In re Consumers Power Co. Sec. Litig., 109 F.R.D. 45, 54 (E.D. Mich. 1985); Herald Co. v. Board of Parole, 131 Misc. 2d 36, 45-46, 499 N.Y.S.2d 301, 308 (Sup. Ct. 1985).

See Globe, 457 U.S. at 605 m.13

See, e.g., Cable News Network v. American Broadcasting Cos., 518 F. Supp. 1238 (N.D. Ga. 1981)

Globe, 457 U.S. at 606-07. Applying this standard to the statute at issue, Justice Brennan found that the interest in protecting the wellbeing of a minor was compelling, but then found that a mandatory closure rule was too broad. See id. at 607-08.

 464 U.S. 501 (1984).
See id. at 504-05.

This, in fact, probably prompted Justice Stevens’ concurrence, in which Justice Stevens said that he wanted to “emphasize” the fact that the holding was based on the poiitical theory of the first amendment. See id. at 516-19 (Stevens, J., concurring).

Id. at 510.

See, e.g., In re Reporters Comm. for Freedom of the Press, 773 F.2d 1325, 1347 (1985) (Wright, J., concurring in part and dissenting in part) (“(T)he Court appears to have weighed historical practice as one factor among many in evaluating the appropriate scope of the right of access.”).

 467 U.S. 39 (1984). Waller was decided four months after Press Enterprise I.

Justice Powell’s opinion relied on the Richmond Newspapers line of cases to establish that right, saying that “there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of apublic trial than the implicit First Amendment right of the press and public.” Id. at 46. His opinion also noted that “(t)o the extent there is an independent public interest in the Sixth Amendment public-trial guarantee(,).. .it applies with full force to suppression hearings.” Id. at 47 n.5.
Two years after Waller, in Press-Enterprise Co. v. Superior Court (Press-Enterprise II, 106 S.Ct. 2735 (1986), the Supreme Court confirmed that Waller recognized a first amendment right of access to suppression hearings: “(I)n Waller v. Georgia. . . . (wje noted that the First Amendment right of access would in most instances attach to (suppression hearings). "Id. at 4270.

 106 S.Ct. 2735 (1986). In Press-Enterprise II, the Court held that the first amendment right of access to criminal proceedings applies to preliminary hearings as they are conducted in California. See id. at 2743.

Press-Enterprise II, 106 S.Ct. at 2741. The Court borrowed this language from Justice Brennan’s opinion in Globe. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606 (1982).

Press-Enterprise II, 106 S.Ct. at 2740.

Id. at 2740.

Id. at 2741.

Id. at 2741-42.

Although it is clear that certain documents, such as transcripts of grand jury proceedings, historically have been beyond the ambit of considerations of first amendment access.

Camus, the celebrated French writer whose works express a courageous humanism, saw it this way: “A free press can of course be good or bad, but most certainly, without freedom it will never be anything but bad x x x Freedom (for the press) is nothing else than a chance to be better, whereas enslavement is a certainty of the worse.”

 Id. (quoting Press-Enterprise I, 464 U.S. 501, 510 (1984)