15 So.3d 1272 (2009)
Karla TEUTSCH, Plaintiff-Appellee,
v.
Richard R. CORDELL, Jr., Defendant-Appellant.
No. 44,565-JAC.
Court of Appeal of Louisiana, Second Circuit.
July 1, 2009.
Rehearing Denied August 5, 2009.
*1273 Cynthia L. Carroll, for Appellant.
D. Rex Anglin, Shreveport, for Appellee, Karla Teutsch.
Joseph C. Seyler, Baton Rouge, for Appellee, S.K.C.
Before BROWN, WILLIAMS and PEATROSS, JJ.
WILLIAMS, J.
The defendant, Richard R. Cordell, Jr., appeals a juvenile court judgment issuing an order of protection from abuse, which, inter alia, prohibits him from having any visitation or contact with his ten year-old daughter until she reaches her eighteenth birthday, or until further order of the court.[1] The defendant was ordered to *1274 seek professional counseling for "sexual perpetrator evaluation and treatment." Temporary custody of the child was granted to the petitioner, Karla Teutsch, who was ordered to obtain "sexual abuse counseling" for the child and to assure that "the child has no contact whatsoever with the defendant." For the reasons set forth herein, we affirm the trial court's judgment.

FACTS
The petitioner, Karla Teutsch, and the defendant, Richard R. Cordell, Jr., are the parents of S.K.C.[2] The petitioner and the defendant were divorced in 2001, and joint custody was awarded to both parents. The custody arrangement was as follows: the petitioner was granted the domicilliary custody of S.K.C.; during the school year, the defendant had visitation with S.K.C. every Wednesday and every other weekend; during the summer months, S.K.C. spent alternate weeks with each parent.
On December 2, 2008, the petitioner filed a petition for protection from abuse on behalf of S.K.C., pursuant to LSA-Ch.C. art. 1564, et seq. The petitioner alleged that S.K.C. had reported to her that "her father was touching her and making her sleep in the same bed as him when she stays with him." The petitioner requested temporary custody of S.K.C. and a temporary restraining order ("TRO") forbidding the defendant from having contact with S.K.C.
On December 11, 2008, S.K.C. was interviewed at the Pine Hill Advocacy Center.[3] During the interview, S.K.C. stated that she slept in the bed with the defendant when she visited him and that the defendant slept in "his underwear, sometimes only his boxer shorts." S.K.C. also stated that the defendant had begun touching her buttocks and breast area while in bed with her, and she wanted the touching to stop.
A TRO was issued on December 12, 2008, prohibiting the defendant from having contact with S.K.C.[4] A hearing on the protective order was held on February 4, 2009.
During the hearing, the petitioner testified that S.K.C. informed her of the touching for the first time on Thanksgiving Day in 2008. She stated that she contacted Child Protective Services, and a worker advised her to file a petition for protection from abuse. The petitioner also testified that S.K.C. had reported that the defendant had "touched her butt again" during a supervised visit at S.K.C.'s birthday party after the TRO was issued. The petitioner stated S.K.C. did not want to continue to visit with the defendant "if that was going to continue to happen." The petitioner further testified that she was aware that S.K.C. slept in the same bed as the defendant during the visits. The petitioner stated that she had voiced an objection to the sleeping arrangements "on several different occasions." She also stated that during an unrelated proceeding, a family court judge had addressed the issue of S.K.C.'s sleeping arrangements during visits with the defendant. The petitioner testified that the judge had told the defendant "that he needed to make other arrangements for [S.K.C.]" and instructed him "not to sleep in the same bed with her."
*1275 Richard Cordell, Sr., the defendant's father, also testified. Mr. Cordell testified that on several occasions, he had "recommended to [S.K.C.] that we would make accommodations for her to have her own bedroom by herself, and [the defendant] was there listening...." Mr. Cordell stated that S.K.C. had never received her own bedroom or bed because "she prefers to sleep with her daddy." Mr. Cordell testified that the defendant and S.K.C. kept the bedroom door open and that he had never seen the defendant touch S.K.C. on her buttocks or breast area. With regard to the allegation of inappropriate touching at the birthday party after the TRO was issued, Mr. Cordell testified that he was within sight and sound of the defendant at all times, and he never saw the defendant touch S.K.C.'s buttocks.
Mary Cordell, the defendant's mother, testified that she was in attendance at the birthday party at which the new allegations of abuse took place. She stated that she was taking pictures and did not see the defendant touch S.K.C. on the buttocks.[5] Mrs. Cordell also testified that she had suggested that S.K.C. be given her own bedroom on several occasions, but S.K.C. "wanted to sleep with her daddy." She stated that she and her husband thought that S.K.C. was "getting a little too old" to be sleeping with the defendant.
At the hearing, the defendant first testified on cross-examination. He admitted that he slept in the bed with S.K.C. when she visited and that he had been doing so since he and the petitioner separated. The defendant testified that he lived with his parents in a house with three bedrooms; one bedroom was occupied by his mother; one bedroom was occupied by his father; one bedroom was occupied by him. The defendant admitted that a family court judge had told him that he "might get [S.K.C.] her own bed." However, the defendant stated that he did not agree with the judge's comment and he did not view the statement as an order, but as "a mere suggestion." The defendant also admitted that his mother had "suggested" to him that his daughter should not be sleeping in the bed with him, but he had not changed the arrangement because he "left that up to [S.K.C.]'s decision." The defendant testified that he "thought she was still of the age that it [sleeping together] was okay." The defendant stated that he did not think anything was wrong with sleeping in the same bed with his daughter. However, he stated that he knew that there was a time when sleeping with S.K.C. would no longer be appropriate, but he believed that age was "eleven, twelve, thirteen." The defendant corroborated S.K.C.'s statements with regard to his sleeping attire. He stated that he typically slept in "boxer shorts and a shirt," but at times, he slept in only the boxer shorts. The defendant admitted that he had touched S.K.C.'s breast area and buttocks, but "never in an inappropriate manner" and "never in a sexual way." He stated that any touching was "accidental" or may have occurred when he was "wrestling" with her in his bed. The defendant testified that he did not see anything wrong with "wrestling" with his daughter in bed, and he did not believe that such horseplay between him and his daughter should take place somewhere other than the bed. The defendant testified that S.K.C. was "honest," but stated that she was "lying" about any inappropriate touching because her "mother put her up to it."
When questioned by the court with regard to what would constitute an "appropriate" *1276 touching of his daughter's breast area, the defendant responded, "Like if you're driving in the car, and she's in the front seat, you slam on the brakes, you touch like that." The colloquy continued as follows:
COURT: You're saying that was what she was talking about when she went to the trouble of going to law enforcement officers, sitting down in front of a stranger and in an almost tearful fashion made these allegations against you? Was she talking about your putting your arm out in front of her to prevent her from hitting the dashboard.
WITNESS: I haven't ever seen the video.
COURT: Do you think your child is so confused and so immature that she would make that kind of mistake?
WITNESS: I think she's very confused.
COURT: That she would confuse you putting your arm out to protect her from hitting the dashboard and accidentally brushing her breasts in the bed [while dressed in] your boxer shorts or fondling her breasts.
WITNESS: No, I don't believe that.
COURT: I don't think so either, so I'm looking for an explanation.
WITNESS: We've never had any trouble until I filed for more custody. To me, in my heart that's
COURT: Sir, we're focusing on the child. How would she confuse what you describe as your admitted appropriate touching of her breasts with what she almost tearfully described as a sexual fondling that she wanted to stop, that she asked you to stop, that she says you continue to do despite her requests to stop [while] in bed with your boxer shorts on, and that you wouldn't stop and kept doing it, and she wanted that behavior to stop? Now, how is that related to sticking your arm and preventing her from getting hit by a dashboard?
WITNESS: It's not.
During his direct testimony, the defendant stated that he did not recall ever touching S.K.C.'s buttocks or breast area. He reiterated that if he did touch her in those areas, it was "not in an inappropriate manner ... never in any type of sexual way." The defendant stated that any touching was "innocent" and that S.K.C. had never told him that she was "uncomfortable with the way [he] touched her."
S.K.C. also testified at the hearing. She testified that she could not recall when the touching started, but "it started one night when we went to bed." S.K.C. stated that the defendant touched her "on my butt" and "squeezed my butt." She testified that at the birthday party at issue, the defendant "placed his hand on my butt ... and he touched it and he grabbed me and pulled me close to him." S.K.C. was unable to recall the statements she made to the interviewer with regard to the touching of her breast area. However, she testified as follows:
Q: [C]an you remember the last time he touched your breast? Or not the time but the last wherever you were when it happened?
* * *
A: It was in bed and I was in front of him and he took his hand and he reached over me.
Q: So, were you sitting on the bed?
A: I was lying down.
Q: Okay. And, I guesswas he lying down also?
A: Yes, ma'am.
Q: And he stretched his hand across and it landed on your breast?
A: Yes, ma'am.
Q: Okay. Did it stay there?

*1277 A: Uh, it did but not a very long period of time.
Q: Okay. What kind of touch was it?
A: I guess it was like a feel.

* * *
S.K.C. also testified about an incident during which the defendant touched her breast area while she was walking her friend's dog. She stated, "He justI guess it was like a hug type of thing and he touched my breast." S.K.C. testified that the defendant had not always touched her in that manner and the touching was "something new." She stated that whenever the defendant would touch her buttocks, she would remove his hand and tell him to "please stop." S.K.C. testified that the touching continued, so "[T]hat's when I told my mama on Thanksgiving."
The court also heard the testimony of Melissa Bass, the defendant's friend who hosted the birthday party. Ms. Bass testified she did not recall observing the defendant touching S.K.C.'s "butt" at the party. Ms. Bass also testified that there was never an occasion that S.K.C. walked her dog. On cross-examination, Ms. Bass admitted that the defendant and S.K.C. had stayed at her house while she was away, and she was unable to say whether they had walked the dogs on those occasions.
Ja'Les Washington, the DSS employee who filed the instanter order, also testified.[6] She stated that her office's investigation into the allegations continued after she filed the order, and there was no information contained in her petition to the court that she would recant. Ms. Washington also testified that she had spoken with S.K.C. since she filed the petition, and S.K.C. had not recanted her statements.[7]
At the conclusion of the testimony, the court stated, "This is a child in need of care because of sexual abuse." The court issued a protective order, prohibiting the defendant from visiting or communicating with S.K.C. The court fixed the order of protection to remain in effect until S.K.C.'s eighteenth birthday, pursuant to LSA-Ch.C. arts. 618 and 1564. The court also granted temporary custody of the child to the petitioner, Karla Teutsch, and ordered her to obtain "sexual abuse counseling" for the child and to assure that "the child has no contact whatsoever with the defendant." The court further ordered the defendant to seek professional counseling for "sexual perpetrator evaluation and treatment."[8] The court stated:

*1278 The child's testimony completely supports her earlier ... statementcompletely removing any hint, any hint that the mother is quote, "putting her up to this." The child testified extremely convincingly that she started the conversation much to her own chagrin. She initiated the conversation bringing her mother to tears on Thanksgiving and on a couple of weeks later when she told her mother sometime later and more fully developed the nature of the offensive touching. She wasn't put up to that.
* * *
There are at least three, maybe four, reasons specifically that I am convinced this was not accidental touching but sexual fondling; and in fact, what it is is grooming behavior.
It starts off with sleeping with a child, innocent at first.... And then we get down to the point where we're wearing less and less clothing and we get to the point where the child's getting older and older and starting to develop but we still continue that sleeping behavior despite what a judge may say. Despite what a person's own parents may say. We continue to do it because we have a plan. We have a goal. And that goal is to develop an illicit sexual partner and it starts at this stage as it creeps along. It starts out innocently ... and then you jump that bridge and you make that offensive touching and you hope that child may enjoy that or at least not put up a fuss. And then you go on to the next stage and the next stage. That's what it is. That's what the professionals tell us it is. And I believe that's what it is.
* * *
She made the statement no one else had ever touched her like that. No one else had accidently touched her like that in her ten years of life, but the father did it in bed. Sound kind of strange? Sounds kind of strange to me.
* * *
"Don't." "Stop." But he continues. He does it again. Accident after accident. No, that's not accident [sic]. That's purposeful grooming behavior.
And it was something that just started a few weeks ago. This was a quote to [sic] her, "Something new." She'd been raised by this parent and had been in close proximity to him for an extended period of time and she'd never complained about accidental touching before. Suddenly, something new is happening. She's lying in bed and her daddy's touching her breasts and her buttocks and keeping his hand there even though she says no. That's not accidental. That's something new. Four reasons. Clearly not accidental and she clearly wasn't put up to it by her mother as I described. And it is a swearing contest between the two and there's no difficulty whatsoever in whom I believe. I believe the child for the reasons I've stated. And I won't allow that grooming behavior to continue and he's going to get treatment before he has visitation and she's going to get counseling.
* * *
The defendant now appeals.

DISCUSSION
The defendant contends the evidence failed to establish that S.K.C. was sexually abused. The defendant argues S.K.C. was "fidgety" during the interview at Pine Hills and did not make eye contact when she was questioned about the alleged touching. He also argues that S.K.C. "was not distraught" during the interview and showed no signs of having been sexually *1279 abused. The defendant also maintains that the court erred in finding that S.K.C.'s testimony was credible because her statements were inconsistent in the following manner: (1) S.K.C. told the interviewer that he had touched her "5 or 6 times" over the course of a month; however, at the hearing, S.K.C. testified that the defendant "squeezed my butt" and "just kinda put his hands on it;" (2) S.K.C. testified that the defendant had touched her "butt" at a birthday party during a supervised visit; however, the defendant's parents, who were supervising the visit, testified that they did not see the defendant touch the child's buttocks during that visit.
The state has a compelling interest in protecting children from sexual abuse. Globe Newspaper Co. v. Superior Ct. for Norfolk County, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040; Buchanan v. Langston, 36,520 (La. App.2d Cir.9/18/02), 827 So.2d 1186. Louisiana has various provisions aimed at protecting children in abusive situations, including certain provisions of the Louisiana Children's Code, the Post Separation Family Violence Relief Act ("PSFVRA"), embodied in LSA-R.S. 9:361 et seq.,[9] and the Protection From Family Violence Act/Domestic Abuse Assistance, embodied in LSA-R.S. 46:2131, et seq. With regard to the abuse of children, namely sexual abuse, courts have invoked the provisions of either statutory scheme to protect the child.
In Folse, supra, the defendant was accused of sexually molesting his four-year-old daughter. The child's mother called the sheriff's office and filed for divorce the following day. The family court granted the mother ex-parte custody and ordered no visitation between the child and her father. A hearing was held, and the trial court, invoking the provisions of the PSFVRA, awarded the mother sole custody of the child and denied the father visitation pending his successful completion of the sexual abuse program, as required by the PSFVRA. The court of appeal reversed, finding that the evidence was insufficient to support a finding of sexual abuse. The Supreme Court granted the mother's application for writ of certiorari and reversed the appellate court's judgment, stating:
Protecting children from family violence, including sexual abuse, is the primary purpose of the PSFVRA. To effectively protect children, the Legislature has imposed a mandatory suspension of custody and visitation against those parents proven to have sexually abused their children.
* * *
The Legislature enacted the PSFVRA because it recognized that the discretion formerly granted to judges regarding custody and visitation in sexual abuse situations was wholly inadequate in curbing family violence, including sexual abuse of children. Through the PSFVRA, therefore, the Legislature has expressed its determination that the best interests of the child would best be served by suspending the abusive parent's visitation pending that parent's completion of the program designed to inhibit further abuse. At issue, then, is *1280 not the innocence or guilt of the parent, but the best interests and custody of the child.
Id. at 1045-46 (internal citations omitted).
Similarly, in Buchanan, supra, the mother filed a petition for domestic abuse assistance alleging the sexual abuse of her minor daughter by the child's father. Pursuant to the provisions of the LSA-Ch.C. art. 1570 and LSA-R.S. 46:2136, the trial court suspended the father's visitation rights and enjoined the father from coming into contact with the child until she attained the age of 18 years. The court further ordered that proceedings to terminate the father's parental rights be commenced. The father appealed, arguing that the trial court erred in suspending his visitation rights and in "terminating" his parental rights. This court affirmed the trial court's ruling, noting that the father's parental rights had been suspended, rather than terminated. This court also found that the trial court did not err in suspending the father's visitation until the child's eighteenth birthday. This court concluded that the trial court was not limited to the provisions set forth in the PSFVRA and the Protection from Family Violence Act. The court noted that LSA-R.S. 46:2139 specifically stated that the granting of relief under that Act "shall not preclude any other relief authorized by law." This court stated:
The trial court in this case fashioned its remedy pursuant to [LSA-Ch.C. art. 1570].... The trial court found by clear and convincing evidence that [the child] had been sexually abused by [the defendant]. Accordingly, LSA-Ch.C. art. 1570(F) left the trial court with no discretion, mandating that the protective order "shall last at least until the child attains the age of eighteen years."
Id. at 1190.
In the instant case, the petition for protection from abuse and the subsequent order of protection were filed and rendered pursuant to LSA-Ch.C. art. 1564 et seq. LSA-Ch.C. art. 1570 provides, in pertinent part:
A. The court may grant any protective order or approve any consent agreement to bring about a cessation of abuse of a party, any children, or any person alleged to be incompetent, which relief may include but is not limited to:
(1) Granting the relief enumerated in Article 1569[TRO].
(2) When there is a duty to support a party, any minor children, or any person alleged to be incompetent living in the residence or household, ordering payment of temporary support or provision of suitable housing for them.
(3) Awarding temporary custody of or establishing temporary visitation rights and conditions with regard to any children or person alleged to be incompetent.
(4) Ordering counseling or professional medical treatment for the defendant or the abused person, or both.
* * *
F. Any final protective order or approved consent agreement shall be for a fixed period of time, not to exceed six months, and may be extended by the court, after a contradictory hearing, in its discretion. When such order or agreement is for the protection of a child under the age of eighteen who has been sexually molested, the period shall last at least until the child attains the age of eighteen years, unless otherwise modified or terminated following a contradictory hearing. Such protective order or extension thereof shall be subject to a devolutive appeal only.
(Emphasis added).
It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of *1281 manifest error or unless those findings are clearly wrong. State ex rel J.B., 35,032 (La.App.2d Cir.5/9/01), 794 So.2d 899; State in the Interest of D.T. v. K.T., 29,796 (La.App.2d Cir.6/18/97), 697 So.2d 665. Great weight is attached to the exercise of the trial judge's discretion, which will not be disturbed on review if reasonable men could differ as to the propriety of the trial court's action. State ex rel J.B., supra.
Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. Id.; In re A.J.F., XXXX-XXXX (La.6/30/00), 764 So.2d 47; Rosell v. ESCO, 549 So.2d 840 (La. 1989); State ex rel J.B., supra. Where the factfinder is presented with two permissible views of the evidence, the factfinder's choice between them is not clearly wrong. Rosell, supra; State ex rel J.B., supra.
In manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify. The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record. In re A.J.F., supra; State ex rel J.B., supra.
In the instant case, the juvenile court was presented with the testimony of several witnesses, including S.K.C. and the defendant. S.K.C. testified that she and the defendant slept in the same bed during her visits, with the defendant dressed in "his underwear, sometimes only his boxer shorts." She stated that the defendant touched her buttocks and breast area, and the touching was different from the way the defendant had touched her in the past; she described the touching as "something new." S.K.C. also testified that she had asked the defendant to "please stop," and had removed his hand from her body; however, the defendant continued to touch her on her buttocks and breast area. S.K.C. became concerned about the defendant's actions and his refusal to stop touching her, so she brought the conduct to the attention of her mother.
The defendant admitted that he slept in the bed with S.K.C., while clad in his underwear. He expressed his belief that nothing was wrong with sleeping with her, despite what others had told him. The defendant did not deny touching S.K.C. on her breast area or buttocks but maintained his belief that the touching "was never in an inappropriate manner" and "never in a sexual way."
We find no manifest error in the trial court's conclusion that S.K.C. was sexually abused by the defendant. The court heard the testimony of the witnesses and made it clear on the record that it believed S.K.C.'s testimony. The trial court's credibility determinations will not be disturbed. This assignment is without merit.
The defendant also contends the trial court erred in adjudicating S.K.C. a child in need of care. The defendant argues that no petition was filed requesting that S.K.C. be adjudicated a child in need of care.[10]
*1282 Our review of this record reveals that the action was initiated as a petition for protection from abuse, not as a child in need of care proceeding. DSS filed an affidavit and instanter order, requesting that an order be issued granting temporary custody of S.K.C. to DSS; however, that matter was not pursued. Although the court stated on the record that S.K.C. was in need of care, no adjudication hearing was held, and no formal in need of care adjudication was made. This argument lacks merit.

CONCLUSION
For the reasons set forth herein, we affirm the juvenile court's ruling granting the order of protection from abuse.[11] Costs of this appeal are assessed to the appellant, Richard R. Cordell, Jr.
AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, PEATROSS, and DREW, JJ.
Rehearing denied.
DREW, J., would grant rehearing.
NOTES
[1] The juvenile court fixed the terms of the protection order to expire on January 22, 2017; the date the minor child will reach the age of eighteen years.
[2] S.K.C. was nine years-old when the petition for protective order was filed. At the time of the hearing, she was ten years-old.
[3] On December 3, 2008, S.K.C. underwent a physical examination at the Cara Center, a facility which treats abused children operated by the Christus Schumpert Health System and Louisiana State University Health Sciences Center. The findings of the examination were normal.
[4] The record shows that the court did allow the defendant to have a supervised visit with S.K.C. on December 25, 2008 and on her birthday.
[5] S.K.C. testified that the defendant touched her "butt" while her grandparents were preoccupied with "fixing hotdogs."
[6] On December 16, 2008, the Department of Social Services ("DSS") filed an affidavit/instanter order under Title VI of the Children's Code, alleging sexual abuse. DSS requested that temporary custody of S.K.C. be granted to DSS. However, DSS has not acted on its petition, pending the outcome of the instant proceedings.
[7] In the affidavit in support of the instanter order, Ms. Washington stated, inter alia:

[T]here is good cause to believe that said child cannot adequately be protected from the following dangers or harm, if the child remains in parental custody: Fondling
That the following reasonable efforts/preventative services have been offered, to no avail to prevent the necessity of removal of the child from the home: The child protection investigator assisted Ms. Teutsch in getting a protective order.
and that the continuation in the family home is contrary to the welfare of the child.
* * *
There is good cause to believe that the child should be removed from the custody of Richard Cordell pending the completion of the investigation....
[8] The court specifically noted that the defendant would have "[n]o visitation until a court hearing at Caddo Juvenile Court at which this Court will determine the defendant has completed sexual perpetrator counseling and this Court finds that visitation was consistent with the child's best interest."
[9] LSA-R.S. 9:364 provides, in pertinent part:

* * *
D. If any court finds, by clear and convincing evidence, that a parent has sexually abused his or her child or children, the court shall prohibit all visitation and contact between the abusive parent and the children, until such time, following a contradictory hearing, that the court finds, by a preponderance of the evidence, that the abusive parent has successfully completed a treatment program designed for such sexual abusers, and that supervised visitation is in the children's best interest.
[10] Before a trial court may adjudicate a child in need of care under Title VI of the Children's Code, the State must allege and prove by a preponderance of the evidence one or more of the statutorily expressed allegations in LSA-Ch.C. art. 606. State ex rel. L.B. v. G.B.B., XXXX-XXXX (La. 12/4/02), 831 So.2d 918. LSA-Ch.C. art. 606(A) provides, in pertinent part:

Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker ... and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
* * *
(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.
[11] We note that the front page of the standard order form signed by the juvenile court provides, "The terms of this order shall be effective until 1-22-1917," rather than X-XX-XXXX. The juvenile court shall amend the order to correct this error. All other references to the year of expiration are correctly written as X-XX-XXXX.